BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. BYRD (190634)
byrd@whafh.com
ALEX J. TRAMONTANO (276666)
tramontano@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

GARY VAN LUVEN, derivatively on behalf of IMMUNITYBIO, INC.

Plaintiff,

vs.

PATRICK SOON-SHIONG, RICHARD ADCOCK, CHERYL L. COHEN, MICHAEL D. BLASZYK, JOHN OWEN BRENNAN, LINDA MAXWELL, WESLEY CLARK, CHRISTOBEL SELECKY, BARRY J. SIMON, and DAVID C. SACHS,

Defendants,

and

IMMUNITYBIO, INC.,

Nominal Defendant.

Case No. **'24CV2014 L    AHG**

**JURY TRIAL DEMANDED**

Gary Van Luven ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant ImmunityBio Inc. ("ImmunityBio" or the "Company"), files this Shareholder Derivative Complaint against Patrick Soon-Shiong ("Soon-Shiong"), Richard Adcock ("Adcock"), Cheryl L. Cohen ("Cohen"), Michael D. Blaszyk ("Blaszyk"),  John Owen Brennan ("Brennan"), Linda Maxwell ("Maxwell"), Wesley Clark ("Clark"), Christobel Selecky ("Selecky"),  Barry J. Simon ("Simon"), and David C. Sachs ("Sachs")  (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of ImmunityBio.

1.    Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ImmunityBio, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the Southern District of California captioned *Salzman v. ImmunityBio, Inc., et al.*, 3:23-cv-01216-BEN-WVG  (S.D.C.A.)  (the  "Securities  Action").  Plaintiff  believes  that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.142-9) promulgated thereunder by the SEC; AND supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

/ / /

**NATURE OF THE ACTION**

2.    This is a shareholder derivative action brought in the right, and for the benefit, of ImmunityBio against certain of its officers and directors (the "Board") seeking to remedy Defendants' violations of law that have occurred from March 10, 2021 to May 10, 2023 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to ImmunityBio and its shareholders, including monetary losses and damages to ImmunityBio's reputation and goodwill.

3.    ImmunityBio is a clinical-stage biotechnology company focused on developing next-generation therapies and vaccines that bolster the immune system to combat cancer and infectious diseases in the U.S. and Europe. The Company's platforms include a range of biologic product candidates, such as antibody-cytokine fusion protein N-803 (commercially known as "Anktiva"), DNA and RNA vaccines, and advanced cell therapies. ImmunityBio utilizes third-party contract manufacturing organizations (CMOs) to produce key product candidates, including Anktiva.

4.    This complaint arises from ImmunityBio's representations to investors that its Anktiva product, a cell fusion protein for treating bladder cancer, was progressing toward FDA approval and that the company had established robust manufacturing processes to support its commercialization. However, these representations were misleading.

5.    In March 2021, ImmunityBio emerged from a merger between two clinical-stage biopharmaceutical companies, NantKwest and a separate company ImmunityBio, Inc. ("ImmunityBio Legacy"), both controlled by Defendant Patrick Soon-Shiong. ImmunityBio Legacy had previously acquired the company that developed Anktiva, its flagship product candidate. After the merger, ImmunityBio continued to rely on the same third-party contract manufacturing organizations (CMOs) to produce the active ingredients for Anktiva while working to scale its manufacturing capabilities and ensure compliance with FDA standards.

6.    However, starting in March 2021, the U.S. Food and Drug Administration

("FDA") began to raise concerns about ImmunityBio's manufacturing processes. The FDA issued a Form 483 in both March and July 2021, documenting significant deviations from current Good Manufacturing Practice (cGMP) standards at ImmunityBio's CMO, AGC Biologics. Despite these serious warnings, ImmunityBio continued to assure investors that its manufacturing processes were in compliance with cGMP. The CMO's failures included delayed batch records, incomplete investigations into manufacturing deviations, and inadequate stability testing for Anktiva, all of which jeopardized production. Numerous batches of Anktiva failed for a variety of reasons.

7.    On May 23, 2022, ImmunityBio submitted a Biologics License Application ("BLA") for Anktiva to the FDA. Throughout the process, the company consistently reassured investors that it had "established Good Manufacturing Practice (GMP) manufacturing capacity at scale with cutting-edge cell manufacturing expertise and ready-to-scale facilities." Investors were led to believe that these facilities, including AGC Biologics, complied with all necessary regulations, despite the ongoing violations noted by the FDA.

8.    Behind the scenes, however, these issues continued. In February 2023, the FDA conducted a pre-license inspection of the CMO responsible for producing Anktiva. Despite the inspection revealing further cGMP violations, ImmunityBio remained silent about these ongoing deficiencies. The company continued to publicly assert that its manufacturing facilities were cGMP-compliant and that Anktiva was on track for approval.

9.    On May 11, 2023, the truth was finally revealed to the public. During pre-market hours, ImmunityBio announced that the FDA had rejected its BLA for Anktiva, not due to any clinical concerns, but because of "deficiencies relating to the FDA's pre-license inspection" of the CMO responsible for manufacturing Anktiva. These deficiencies, which had persisted despite prior warnings, ultimately led to the FDA's refusal to approve the drug.

10.    The news came as a shock to investors, who had been repeatedly assured

that the company's manufacturing processes were compliant with FDA regulations. On this revelation, ImmunityBio's stock price dropped by $3.43 per share, or 55.14%, closing at $2.79 on May 11, 2023, resulting in substantial financial losses for investors.

11.     Throughout the Relevant Period, Defendants failed to disclose the ongoing deficiencies in ImmunityBio's manufacturing processes to investors. Instead, they represented that ImmunityBio had contracted with a "multi-national biologics manufacturer with multiple cGMP-compliant facilities" for its Anktiva product candidate and asserted that "those facilities ha[d] robust process development, validation, and quality oversight."

12.     Throughout the Relevant Period, the Individual Defendants made or caused ImmunityBio to make false and misleading statements and/or failed to disclose that, among other things: (1) ImmunityBio conducted insufficient due diligence to discover, or else did discover and ignored, GMP deficiencies at its third party CMOs for Anktiva; (2) one or more of the Company's third-party CMOs for Anktiva did in fact suffer from cGMP deficiencies; (3) the foregoing deficiencies was likely to cause the FDA to reject the Akitva BLA in its present form; (4) accordingly, the Company overstated the regulatory approval prospects for the Ankitva BLA; and (5) as a result the public statements were materially false and misleading at all relevant times.

13.     As a result of the foregoing, ImmunityBio, as well as the Company's CEO, CFO, and Chief Scientific and Medical Officer, were named as defendants in the Securities Action by investors who allege they were damaged when they purchased ImmunityBio shares during the Relevant Period.

14.     On June 20, 2024, the court in the Securities Class Action denied the defendants' motion to dismiss under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). These actionable statements will expose the Company to significant class-wide liability moving forward.

15.     Due to the breaches of fiduciary duty by the Individual Defendants, most of whom are current directors, the collective engagement in fraud and misconduct, and

the substantial likelihood of their liability in this derivative action and the Securities Action, a majority of ImmunityBio's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

16.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.142-9) promulgated thereunder by the SEC.

17.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

18.  In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.  This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

21.  Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

**PARTIES**

**Plaintiff**

22.    Plaintiff is, and has been at all relevant times, a shareholder of ImmunityBio.

**Nominal Defendant**

23.    Nominal Defendant ImmunityBio is incorporated under the laws of Delaware, with its principal executive offices located at 3530 John Hopkins Court, San Diego, California 92121. ImmunityBio common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "IBRX."

**Individual Defendants**

24.    Defendant Patrick Soon-Shiong ("Soon-Shiong") founded ImmunityBio in 2015 and has served as Executive Chairman of the Board since October 2020 and as Global Chief Scientific and Medical Officer since August 2021. Soon-Shiong previously served as Chairman of the Board and Chief Executive Officer from March 2015 to October 2020.  Additionally, Soon-Shiong is named as a defendant in the Securities Class Action.

25.    The Company's 2024 Proxy Statement stated the following about Defendant Soon-Shiong:

Patrick Soon-Shiong, M.D., FRCS (C), FACS was appointed Executive Chairman of the Board in October 2020 and Global Chief Scientific and Medical Officer of the company on August 11, 2021. Previously, he served as the Chairman of the Board and Chief Executive Officer from March 2015 to October 2020, as the Co-Chairman of the Board from December 2014 to March 2015, and as our Chief Medical Officer from January 2015 to March 2015. In 2011, he founded NantWorks, LLC (NantWorks), an ecosystem of companies to create a transformative global health information and next generation pharmaceutical development network, for the secure sharing of genetic and medical information. Dr. Soon-Shiong invented and developed Abraxane®, the nation's first Food and Drug Administration (FDA)-approved protein nanoparticle albumin-bound delivery technology for the treatment of cancer. Abraxane was approved by the FDA for metastatic breast cancer in 2005, lung cancer in 2012, and pancreatic cancer in 2013. Abraxane is now approved in many countries across the globe. From 1997 to 2010, Dr. Soon-Shiong served as founder, chairman, and chief executive officer of two global pharmaceutical companies, American Pharmaceutical Partners (sold to Fresenius SE for $4.6 billion in 2008) and

Abraxis BioScience (sold to Celgene Corporation for $3.8 billion in 2010). In 2018, he became the owner and executive chairman of the Los Angeles Times, Los Angeles Times en Español and other publications under the California Times. Dr. Soon-Shiong is chairman of the Chan Soon-Shiong Family Foundation and the Chan Soon-Shiong Institute of Molecular Medicine, a nonprofit medical research organization. He also serves as chair of the board of directors of the Access to Advanced Health Institute, a nonprofit biotech research institute located in Seattle focused on combating some of the world's deadliest diseases, including COVID-19, cancer, fungal and parasitic infections, and other non-communicable diseases. He is a visiting Professor at the Imperial College of London. Dr. Soon-Shiong holds a degree in medicine from the University of the Witwatersrand and a M.Sc. in science from the University of British Columbia. We believe Dr. Soon-Shiong is qualified to serve as a member of the Board based on his depth of expertise as chairman and chief executive officer of multiple multi-billion dollar companies in the life sciences industry, his broad experience in the research and development of pioneering technologies, and his educational background. Pursuant to the Subscription and Investment Agreement between the company and Cambridge Equities, LP (Cambridge), Cambridge has the right to designate one individual to be nominated and recommended for election by the Board for as long as Cambridge continues to hold at least 20% of the issued and outstanding shares of the company's common stock. Dr. Soon-Shiong has been selected by Cambridge to hold this Board seat.

26.    Defendant Richard Adcock ("Adock") has served as the Company's Chief Executive Officer since October 2020 and as President of the Company and a member of the Board since March 2021.  Additionally, Adcock is named as a defendant in the Securities Class Action.

27.    The Company's 2024 Proxy Statement stated the following about Defendant Adock:

Richard Adcock has served as our Chief Executive Officer since October 2020 and as President of the company and a member of the Board since March 2021. He has over 30 years of leadership experience in the healthcare industry. From January 2018 to September 2020, he served as chief executive officer of Verity Health System of California, Inc. (Verity Health), a nonprofit public benefit corporation healthcare provider, that he steered through a successful restructuring event. Prior to joining Verity Health, he served in various capacities at Sanford Health, a not-for-profit integrated healthcare delivery system, including as its chief innovation officer, president, executive vice president and director from

2004 to 2017. Prior to Sanford Health, he served as global engineering director at GE Healthcare. Mr. Adcock holds a B.S. in Business Administration from Northern State University and an M.B.A. in Healthcare Management from University of Phoenix. We believe Mr. Adcock is qualified to serve as a member of the Board based on his extensive knowledge of the healthcare industry and his experience in senior management roles at leading healthcare companies.

28.    Defendant Cheryl L. Cohen ("Cohen") has served as Lead Independent Director since March 2023 and as a member of the Board since June 2019.

29.    The Company's 2024 Proxy Statement stated the following about Defendant Cohen:

Cheryl L. Cohen was appointed Lead Independent Director in March 2023 and has served as a member of the Board since June 2019. Since 2014, Ms. Cohen has served as principal owner and president of CLC Consulting, LLC, a pharmaceutical and biotechnology consulting firm specializing in new product start-up and commercialization. Prior to CLC, she served as chief commercial officer of Medivation, Inc., a publicly-traded bio-pharmaceutical company, from 2011 until 2014. From 2007 to 2008, she served as Vice President, Strategic Commercial Group, of Health Care Systems, Inc., a Johnson & Johnson company, and from 1998 to 2007, she worked at Janssen Biotech, Inc. (formerly Centocor Biotech, Inc.), a Johnson & Johnson company, in a variety of senior sales roles including Vice President, Rheumatology Franchise. Ms. Cohen has served on the board of directors of Celldex Therapeutics, Inc. (Nasdaq:CLDX) since June 2022. She previously served on the board of directors of MEI Pharma, Inc. (Nasdaq:MEIP), Ignyte Acquisition, Corp. (Nasdaq:IGNY), Aerpio Pharmaceuticals, Inc., Eledon Pharmaceuticals, Inc. (formerly known as Novus Therapeutics, Inc.) (Nasdaq:ELDN), Vital Therapies, Inc., Protein Sciences Corporation, and LadRx Corporation (formerly CytRx Corporation (OTCQB:LADX)). She began her career at Solvay Pharmaceuticals in a variety of sales positions. Ms. Cohen received her B.A. from Saint Joseph College. We believe Ms. Cohen is qualified to serve as a member of the Board based on her extensive experience with and knowledge of the healthcare industry, commercialization expertise, and experience serving on boards of directors of public companies.

30.    Defendant Michael D. Blaszyk ("Blaszyk") has served as a member of the Board since July 2015.

31.    The Company's 2024 Proxy Statement stated the following about

Defendant Blaszyk:

> Michael D. Blaszyk has served as a member of the Board since July 2015. Since July 2017, Mr. Blaszyk has served as an operating partner of Beecken Petty O'Keefe & Company, LLC (BPOC), a capital markets company. Prior to BPOC, he served as the chief financial officer and chief corporate officer of Dignity Health (formerly known as Catholic Healthcare West), a not-for-profit public benefit corporation, from December 2000 until his retirement in December 2015. Prior to joining Dignity Health, he served as the senior vice president and chief financial officer of University Hospitals Health System in Cleveland, Ohio, a healthcare system, from 1997 to 2000. He also previously served as the managing partner of the Northeast Region Health Care Provider Consulting Practice for Mercer LLC (formerly known as William M. Mercer), a global consulting firm, and the executive vice president of Boston Medical Center, a not-for-profit academic medical center. Mr. Blaszyk is a director/manager for Medicus, NantHealth (a company affiliated with Dr. Soon-Shiong), and Health Management Associates. He received his B.S. in Life Sciences from Wayne State University and his Masters in Health Administration from the University of Colorado. We believe Mr. Blaszyk is qualified to serve as a member of the Board based on his extensive experience with and knowledge of the healthcare industry and his significant financial and accounting background.

32.     Defendant John Owen Brennan ("Brennan") has served as a member of the Board since February 2021.

33.     The Company's 2024 Proxy Statement stated the following about Defendant Brennan:

> John Owen Brennan has served as a member of the Board since March 2021. Mr. Brennan served on the board of directors of ImmunityBio, Inc. (a private company) from February 2021 until March 9, 2021. Mr. Brennan served for 29 years in a variety of roles at the U.S. Central Intelligence Agency (CIA), rising from analyst to station chief, and was ultimately appointed as the agency's Director by President Barack Obama, leading the CIA from March 2013 to January 2017. From 2009 to 2013, he served as Deputy National Security Advisor for Homeland Security and Counterterrorism and has also served as a senior national security and intelligence analyst and contributor for NBC and MSNBC since February 2018. Mr. Brennan has served on numerous boards of advisors and boards of directors of private sector companies, including his current service on the Swiss Re Strategic Council. He earned a Bachelor of Arts degree from

Fordham University, which included study abroad at the American University in Cairo, and is a Distinguished Fellow, Center on National Security, Fordham University School of Law. He earned a Master of Arts from the University of Texas at Austin, where he currently serves as a Distinguished Scholar, Intelligence Studies Project. He is also a Member, International Institute for Strategic Studies Board of Trustees, a Member, Homeland Intelligence Experts Group, Officer of Intelligence & Analysis, U.S. Department of Homeland Security, a Principal, WestExec Advisors, a Member, Treliant LLC Board of Managers, a Senior Advisor, McKinsey & Company, Inc, a Member, Avenue Sustainable Solutions Fund L.P. Board of Advisors, and a Director, Performance Drone Works LLC. We believe Mr. Brennan is qualified to serve as a member of the Board based on his demonstrated fidelity and leadership experience throughout his career, and his acumen for public affairs.

34.    Defendant Linda Maxwell ("Maxwell") has served as a member of the Board since March 2021.

35.    The Company's 2024 Proxy Statement stated the following about Defendant Maxwell:

Linda Maxwell, M.D., M.B.A., FRCSC has served as a member of the Board since March 2021. Dr. Maxwell is an experienced physician and surgeon, having managed her own head and neck surgical practice since 2006. She is a medical educator, a published scientific author, and a health technology entrepreneur and innovator. As of March 2022, she is an Operating Partner at DCVC Management Co, LLC, a venture capital fund. She was previously an Adjunct Professor of Surgery at University of Toronto, a Distinguished Visiting Professor at Toronto Metropolitan University, and an Associate Scientist at the Li Ka Shing Knowledge Institute in Toronto. She is the Founder and former Executive Director of the Biomedical Zone at Toronto Metropolitan University, Canada's premier hospital-embedded medical technology incubator for early-stage digital health and medical technology companies, and has guided a wide variety of startup companies through clinical development, capitalization and commercialization. She has also managed a life sciences tech transfer portfolio at the University of Oxford and the UK National Health Service, executing patent strategy, spin-out company formation, and early-stage capital raising. She has also served as a healthcare innovation expert to various Canadian federal, provincial, and local government entities, as a member of the Department Audit Committee of the Public Health Agency of Canada, and as an advisor to the Canadian Medical Association and the Canadian Space Agency. She currently

serves on the board of directors of United Therapeutics Corporation. Dr. Maxwell earned an A.B. with honors from Harvard University, an M.D. from Yale University School of Medicine, and an M.B.A. from the Saïd Business School at the University of Oxford. We believe Dr. Maxwell is qualified to serve as a member of the Board based on her extensive medical and scientific knowledge and experience, and her experience advising and cultivating companies in the health technology industry.

36.    Defendant Wesley Clark ("Clark") has served as a member of the Board since February 2021.

37.    The Company's 2024 Proxy Statement stated the following about Defendant Clark:

Wesley Clark has served as a member of the Board since March 2021. General Clark, USA, Retired, served on the board of directors of ImmunityBio, Inc. (a private company) from February 2021 until March 9, 2021. He served for 34 years in the U.S. Army, rising through the ranks to earn his fourth star as a full general in 1996. He served as the Supreme Allied Commander Europe of NATO from 1997 to 2000, where he commanded Operation Allied Force in the Kosovo War. Highly decorated throughout his career, Gen. Clark was awarded the U.S. Presidential Medal of Freedom by President William J. Clinton. Since March 2003, he has served as chairman and chief executive officer of Wesley K. Clark & Associates, LLC, a consulting firm specializing in business development, crisis support and strategic communications. Since 2010, he has served as chairman and chief executive officer of Enverra, Inc., a boutique investment bank. Gen. Clark has served on the board of directors of Equinox Gold Corp. (TSX:EQX, NYSE American:EQX) since 2016 and served on the board of directors of Rentech, Inc. from 2010 to 2018. He is a graduate of the U.S. Military Academy at West Point, where he was class valedictorian. After graduating from West Point, he was awarded a Rhodes Scholarship to the University of Oxford where he earned degrees in philosophy, politics and economics. He earned a master's degree in military science from the Command and General Staff College. We believe Gen. Clark is qualified to serve as a member of the Board based on his extensive leadership experience, success in both the public and private sectors, and experience serving on other public company boards of directors.

38.    Defendant Christobel Selecky ("Selecky") has served as a member of the Board since August 2020.

39.    The Company's 2024 Proxy Statement stated the following about

Defendant Selecky:

> Christobel Selecky has served as a member of the Board since March 2021. Ms. Selecky served on the board of directors of ImmunityBio, Inc. (a private company) from August 2020 until March 9, 2021. Ms. Selecky has more than 35 years of healthcare industry experience. She is the principal at Population Health Strategies, her healthcare consultancy, where since 2009 she has provided strategic consulting to management teams, companies and investors, helping improve patient engagement, population health outcomes, and healthcare cost management. Since 2014 she has served as a Strategic Advisor at Ceresti Health, a privately-held healthcare technology company, and has served as a lecturer in Healthcare Entrepreneurship for the M.B.A. program at the University of California, Irvine since 2017. She held several leadership positions over her 14-year career at FHP International Corporation, which ended in 1995 including as President of the FHP California Health Plan. She subsequently co-founded, and served as President, CEO, and Executive Chairman of LifeMasters Supported SelfCare, a national leader in the field of disease and population health management. She currently serves on the boards of directors of Teleperformance SE (TEP – ISIN: FR0000051807 – Reuters: TEPRF.PA – Bloomberg: TEP FP), a French public company providing business services, Satellite Healthcare, a leading not-for-profit provider of kidney dialysis and related services, and Griswold Home Care, a privately-held non-medical home care company. She is active in several board governance organizations such as NACD (where she is a board member of the Pacific Southwest Chapter), the Private Directors Association, and Women Corporate Directors and has been a member of audit, compensation, governance and other committees of boards of directors on which she has served. Ms. Selecky received her B.A. from the University of Delaware and her M.A. from Syracuse University. We believe Ms. Selecky is qualified to serve as a member of the Board based on her extensive experience in and knowledge of the healthcare industry, experience in board governance, and experience in advising stakeholders of healthcare companies at various stages of growth.

40.    Defendant Barry J. Simon ("Simon") has served as a member of the Board since 2007 and as Chief Corporate Affairs Officer since March 2021.  Simon was also the Company's CEO from 2007 to 2015.

41.    The Company's 2024 Proxy Statement stated the following about Defendant Simon:

Barry J. Simon, M.D. has served as a member of the Board since 2007 and as Chief Corporate Affairs Officer of the company since March 2021. Dr. Simon previously served as our President and Chief Administrative Officer from January 2017 to March 2021, and as President and Chief Operating Officer from 2015 to 2016. From 2007 to 2015, he was our President and Chief Executive Officer. He has served as president, chief executive officer and chairman of Brink Biologics Inc., a bioanalytics, reagents and testing services company (a company affiliated with Dr. Soon-Shiong), since March 2015. Previously, he held vice president, senior level, and advisory positions at F. Hoffmann-La Roche, a global healthcare company, Roche Labs, a pharmaceuticals company, Connetics Corporation, a specialty pharmaceutical company, Immunomedics, a biopharmaceutical company, Immusol, a biopharmaceutical company, HealthPro BioVentures, LLC, a healthcare and life sciences investment bank, and NorthSound Capital, LLC, a U.S.-based hedge fund. He currently serves as a director of Viracta Therapeutics, Inc. (Nasdaq:VIRX), a biopharmaceutical company, since March 2021. He previously served as a director of Cue Biopharma, Inc. (Nasdaq:CUE), a biopharmaceutical company, from 2016 to June 2021 and as a director of Viracta from July 2017 to November 2020. He has broad experience in public and private settings, having led private and public equity offerings, product and portfolio divestitures and acquisitions, strategic licensing and joint ventures, as well as commercial product launches, investigational new drug and biologics license application regulatory filings, human-enabling programs, manufacturing, quality control and life cycle management. He has worked across several therapeutic areas including oncology, virology, ophthalmology and dermatology on products launches including Xeloda®, Pegasys®, Fortovase®, Tamiflu®, Camptobell®, Boniva®, Fuzeon®, Valcyt®, and Accutane®. He attended corporate training programs through the London School of Business and Amos Tuck School of Business at Dartmouth College. Dr. Simon trained clinically in Infectious Diseases at Albert Einstein College of Medicine, Anesthesiology at The Mount Sinai Medical Center, and Internal Medicine at New York University and received his M.D. from the SUNY Downstate Health Sciences Center in New York. We believe Dr. Simon is qualified to serve as a member of the Board based on his extensive medical and scientific knowledge and experience, and senior management experience in the biopharmaceutical industry.

42.    Defendant David C. Sachs ("Sachs") has served as Chief Financial Officer of the Company since July 2019.  Additionally, Sachs is named as a defendant in the Securities Class Action.

43.    The Company's 2024 Proxy Statement stated the following about Defendant Sachs:

> David Sachs has served as our Chief Financial Officer since March 2021. He previously served as the chief financial officer of NantCell, Inc. from July 2019 to March 2021. He also served as chief financial officer of Integrity Healthcare, LLC (a NantWorks subsidiary) from February 2018 to August 2020. From April 2011 to June 2019, he held various executive positions at NantWorks and its subsidiaries, including serving as chief financial officer of NantHealth, Inc. from 2013 to 2015. Prior to NantWorks, he served in business development roles at Celgene Corporation and Abraxis BioScience and as an investment banker with Bank of America Merrill Lynch. Mr. Sachs received his B.A. in Economics from the University of California at Los Angeles and his M.B.A. in Finance and Strategy from the UCLA Anderson School of Management.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

44.    By reason of their positions as officers, directors, and/or fiduciaries of ImmunityBio and because of their ability to control the business and corporate affairs of ImmunityBio, the Individual Defendants owed ImmunityBio and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

45.    The Individual Defendants were and are required to use their utmost ability to control and manage ImmunityBio in a fair, just, honest, and equitable manner.

46.    The Individual Defendants were and are required to act in furtherance of the best interests of ImmunityBio and its shareholders to benefit all shareholders equitably.

47.    Each director and officer of the Company owes ImmunityBio and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

48.    As fiduciaries of ImmunityBio, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

49.    The officers and directors of ImmunityBio were and are required to

exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

50.    Each Individual Defendant under their position as officers of ImmunityBio, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

51.    As ImmunityBio's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

52.    The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, *inter alia*, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

53.    As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

54.    The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

    a)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, the United States, and pursuant to ImmunityBio's Code of Conduct and internal guidelines;

b)   Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)   Remain informed as to how ImmunityBio conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection and in addition to that and to take steps to correct such conditions or practices;

d)   Establish and maintain systematic, accurate records and reports of the business and internal affairs of ImmunityBio and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

e)   Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that ImmunityBio's operations would comply with all laws and ImmunityBio's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate.

f)   Exercise reasonable control and supervision over the Company's officers and employee's public statements and any other reports or information that the Company was required by law to disseminate.

g)   Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h)   Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.   Each of the Individual Defendants also bore a duty of loyalty to ImmunityBio and its shareholders, mandating the prioritization of the Company's and its shareholders' interests above their own in the management of the Company's affairs

and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

56.    During the pertinent times, the Individual Defendants served as agents for each other and for ImmunityBio, always operating within the parameters of their agency.

57.    The Individual Defendants, through their advisory, executive, managerial, and directorial roles within ImmunityBio, were privy to detrimental, confidential information concerning the Company.

58.    Due to their positions of influence and authority, the Individual Defendants had the capability to, and indeed did, directly or indirectly control the improper actions detailed in this complaint, as well as the content of the various public declarations made by ImmunityBio.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59.    In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

60.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

61.    The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

62.    To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, each of the Individual Defendants, being directors of ImmunityBio, was a direct, essential, and significant participant in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

63.    Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of their overall role in furthering the misconduct.

64.    At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of ImmunityBio, and at all times operated within the course and scope of that agency.

## IMMUNITYBIO'S CODE OF CONDUCT

65.    The Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with ImmunityBio's Code of Business Conduct and Ethics (the "Code of Conduct"). The Code of Conduct states, in pertinent part, the following:

### INTRODUCTION

At ImmunityBio, Inc. ('ImmunityBio' or the 'Company'), we value our integrity above all else. As an employee or representative of ImmunityBio, we expect you to support our integrity by behaving lawfully and ethically at all times. This Code of Business Conduct and Ethics (Code) serves as one of the guideposts for your behavior ...

In general, we expect you to:

- Comply with all applicable laws, rules, and regulations;

- Take responsibility for your actions and follow through on your commitments;

- Avoid situations where your personal interests are, or appear to be, in conflict with ImmunityBio's interests;

- Protect and properly use ImmunityBio's information, assets, and resources;

- Protect information that is owned by our customers and vendors;

- Communicate in an honest and open manner; and

- Adhere to ImmunityBio's standards for protecting the environment and the safety and health of our employees, our customers, our community, and our contractors.

\*\*\*

If you violate the law, this Code, the ImmunityBio comprehensive compliance program, or another ImmunityBio policy or procedure, you will be subject to discipline up to and including immediate termination of employment…

This Code applies to all officers, employees, contract representatives, and agents of ImmunityBio.

\*\*\*

## PRINCIPLE 1: BE HONEST AND ETHICAL

**<u>Fair Dealing</u>**

You must not improperly use business courtesies to gain a competitive advantage. Offering, giving, soliciting, or receiving any form of bribe or kickback is strictly prohibited. You must treat customers, suppliers, competitors, fellow employees, and other stakeholders honestly and fairly. Never take unfair advantage of anyone through manipulation, concealment, disclosure of confidential information, or false or misleading statements.

**ImmunityBio Records**

All ImmunityBio books, records, and accounts must be accurate and complete, and transactions must be recorded in a timely manner. You are personally responsible for the integrity of the information, reports, and records under your control. You must never make any false or artificial entries for any purpose.

Financial statements must be prepared in accordance with generally accepted accounting principles and must represent, in all material respects, the financial condition and results of the Company.

\*\*\*

**Public Communications**

You may not communicate externally on behalf of ImmunityBio unless you are authorized to do so. ImmunityBio has established specific policies regarding who may communicate information to the public, the press, market professionals (such as securities analysts, institutional investors, investment advisors, brokers and dealers) and security holders on behalf of ImmunityBio.

\*\*\*

### PRINCIPLE 2:  COMPLY WITH THE LAW

ImmunityBio is committed to conducting its business activities in accordance with applicable federal and state laws and regulations. You must have a general understanding of the laws and regulations that apply to ImmunityBio's business activities. Contact a member of the management team if you have any questions about whether certain conduct complies with the law.

**Pharmaceutical Laws**

The U.S. Food and Drug Administration (FDA) is the federal agency responsible for overseeing the safety of pharmaceuticals, biologics, and other products under the Federal Food, Drug, and Cosmetic Act (FD&C Act) and its implementing regulations. FDA regulates almost every aspect of ImmunityBio's business, including the research, development, manufacturing, distribution, marketing, and promotion of our products.

\*\*\*

- 20 -

**Securities Laws**

You may not directly or indirectly—through, for example, significant others, family members or controlled entities—buy or sell stocks or other securities of ImmunityBio or any other company based on non-public information obtained from your work at ImmunityBio. In addition, you may not "tip" others by providing them non-public information under circumstances that suggest that you were trying to help them make an investment decision. These obligations are in addition to your obligations with respect to non-public information generally.

Under U.S. securities laws, it is unlawful for any person who has "material" non-public information about a company to trade in the stock or other securities of that company or to disclose such information to others who may trade. Material non-public information is information about a company that is not known to the general public and that a typical investor would consider important in making a decision to buy, sell, or hold securities. Violations of U.S. securities laws may result in civil and criminal penalties, including disgorgement of profits, civil judgments, fines, and jail sentences.

You should be aware that stock market surveillance techniques are becoming increasingly sophisticated, and the probability that U.S. federal or other regulatory authorities will detect and prosecute even small-level trading is significant. Insider trading rules are strictly enforced, even in instances when the financial transactions seem small.

You may not make an unauthorized disclosure of any non-public information acquired in the course of your service with ImmunityBio or misuse material non-public information in securities trading. Any such actions will be deemed violations of ImmunityBio's Insider Trading Policy. All associates should be familiar with ImmunityBio's policy regarding Insider Trading. If you have any questions at all regarding trading in ImmunityBio's securities, contact the Compliance Department for guidance.

\*\*\*

## PRINCIPLE 3:  COOPERATE WITH INVESTIGATIONS AND INQUIRIES

**Government Requests and Investigations**

It is ImmunityBio's policy to cooperate with all government agencies with respect to any request for information or facility visits in connection with a

government investigation.

If an employee is contacted by any government agency, he or she should immediately notify his or her supervisor. If an employee is approached in the field (e.g., at a customer's office or at the employee's home) by an investigator, the employee has the right to obtain legal representation before allowing the investigator to proceed.

If an investigator requests to see ImmunityBio documents, immediately notify the General Counsel and obtain approval before providing any materials. If the investigator presents a search warrant or a subpoena, the warrant or subpoena should be delivered immediately to the General Counsel, but the employee must not obstruct a search pursuant to a search warrant.

During a facility visit, employees should cooperate fully with inspectors throughout the inspection process, answering any appropriate questions the inspectors may have.

If an employee receives an inquiry, a subpoena, or other legal document regarding ImmunityBio's business, whether at home or in the workplace, from a governmental agency, ImmunityBio requests that the employee notify his or her supervisor and the General Counsel immediately. At times, we may be involved in litigation and, because we are in a heavily regulated business, we may be subject to government reviews. As a result, ImmunityBio employees may receive summons, subpoenas, and requests for production of documents.

**Before** accepting a summons, subpoena, or other service of process or signing a summons, contact the General Counsel. You are not authorized to accept service of process on behalf of the ImmunityBio. Do not release any documents or discuss the case without first notifying the General Counsel.

Employees should never provide false or misleading statements to any government official or fail to disclose or take efforts toto conceal any information pertinent to an investigation.

## Internal Audits and Investigations

As part of the ImmunityBio comprehensive compliance program, from time to time the Company will audit our compliance with internal policies, as well as with laws and regulations. You must cooperate with all audits and be truthful and accurate when responding to audit requests.

In addition, ImmunityBio promptly investigates all reports of misconduct. As with audits, you must cooperate with such investigations and provide truthful and accurate information if you are questioned in the course of an investigation. You must not mislead an investigator, alter, or destroy any relevant documents,

or otherwise impede or interfere with the investigation in any way.  Impeding or interfering with an investigation can result in disciplinary action, up to and including termination.

***

## PRINCIPLE 5:  COMPLY WITH IMMUNITYBIO POLICIES AND PROCEDURES

### Policies and Procedures

In addition to this Code, ImmunityBio has adopted policies and procedures that govern all aspects of our business.  Policies provide detailed legal and compliance standards.  Procedures set forth specific processes to follow.

While some policies and procedures apply to all ImmunityBio employees, others are tailored to specific job functions.  You must know and comply with all internal policies and procedures that apply to you.

### Seeking Guidance

If you are unsure whether particular conduct is consistent with a ImmunityBio policy or procedure, you should consult your supervisor before engaging in the conduct.

### Approvals and Waivers

Any action (or inaction) prohibited by this Code may be specifically approved in advance, or specifically waived subsequently, by the Board of Directors or its designated committee.  Except as otherwise provided in the Code, the Board of Directors or its designated committee must review and approve any matters requiring special permission under the Code for a member of the Board of Directors or an executive officer.  Except as otherwise provided in the Code, the Chief Financial Officer or appropriate Compliance Department personnel must review and approve any matters requiring special permission under the Code for any other employee, agent, or contractor.

Any approval or any waiver of any provision of this Code for a member of the Board of Directors or an executive officer must be approved in writing by the Board of Directors or its designated committee and promptly disclosed, along with the reasons for the waiver, to the extent required by law or regulation.  Any approval or any waiver of any provision of this Code with respect to any other

employee, agent, or contractor must be approved in writing by the Chief Financial Officer or appropriate Compliance Department personnel.  Copies of approvals and waivers will be retained by ImmunityBio.

**Reporting Violations**

You must immediately report any violations or potential violations of this Code, a law or regulation, or an ImmunityBio policy or procedure to your supervisor.  You may report violations or potential violations by using the Company's reporting hotline by calling 1-833-7658563, online at immunitybioinc.ethicspoint.com, or on a mobile intake site at immunitybiomobile.ethicspoint.com.  You must also cooperate with any investigations of wrongdoing.

You will not be disciplined or retaliated against for making a good faith report of a violation or potential violation, unless it is your own.

**IMMUNITYBIO'S CORPORATE GOVERNANCE GUIDELINES**

66.    ImmunityBio's Amended and Restated Corporate Governance Guidelines (the "Guidelines") emphasize the Board's responsibility to ensure transparency, integrity, and accountability in all communications and disclosures made by the company. According to the Guidelines, the Board is explicitly tasked with overseeing management's performance and ensuring that stockholders' interests are protected:

**1. Role of the Board**

The role of the Board of Directors at the Company is to oversee the performance of the chief executive officer (the "CEO") and other senior management and to assure that the best interests of stockholders are being served. To satisfy this responsibility, the directors are expected to take a proactive approach to their duties and function as active monitors of corporate management. Accordingly, directors provide oversight in the formulation of the long term strategic, financial and organizational goals of the Company and of the plans designed to achieve those goals.  In addition, the Board reviews and approves standards and policies to ensure that the Company is committed to achieving its objectives through the maintenance of the highest standards of responsible conduct and ethics and to assure that management carries out their dayto-day operational duties in a competent and ethical manner.

The day-to-day business of the Company is carried out by its employees, managers and officers, under the direction of the CEO and the oversight of the

Board, to enhance the long term value of the Company for the benefit of stockholders.  The Board and management also recognize that creating long term enterprise value is advanced by considering the interests and concerns of other stakeholders, including the Company's employees, customers, creditors and suppliers as well as the community generally.

Information and data that are important to the Board's or applicable Board committee's understanding of the business to be conducted at a Board or Board committee meeting, as applicable, should generally be distributed in writing to the Board or such Board committee a reasonable time in advance of such meeting to allow for sufficient review of the materials.  Directors should review in advance any materials sent to them before each Board and Board committee meeting.  Each director should endeavor to attend all Board meetings and all meetings of the Board committees on which such director sits.

The directors know their position requires them to ask probing questions of management and outside advisors.  The directors also rely on the advice, reports and opinions of management, counsel and expert advisers.  In doing so, the Board evaluates the qualifications of those it relies upon for information and advice and also looks to the processes used by managers and advisors in reaching their recommendations.  In addition, the Board has the authority to hire outside advisors at the Company's expense if they feel it is appropriate.

\*\*\*

## IMMUNITYBIO'S AUDIT COMMITTEE CHARTER

67.    In addition to these duties, under the Audit Committee Charter in effect during relevant times, Defendants Blaszyk (Chair), Cohen, Maxwell, and Selecky ("Audit Committee Defendants") owed specific additional duties to ImmunityBio. Specifically, the Audit Committee Charter States:

**PURPOSE**

The purpose of the Audit Committee (the "Committee") is to assist the Board of Directors (the "Board") of ImmunityBio, Inc. (the "Company") in fulfilling its responsibilities for overseeing:

- The Company's accounting and financial reporting processes and internal control over financial reporting, as well as the audit and integrity of the Company's financial statements.

- The qualifications, independence and performance of the Company's independent registered public accounting firm (the "independent auditor").

- The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).
- Risk assessment and risk management.

- Such other matters as provided in this charter.

***

## RESPONSIBILITIES

The following are the principal recurring responsibilities of the Committee. The Committee may perform such other functions as are consistent with its purpose and applicable law, rules and regulations or as the Board may request.

1. <u>Select and Hire the Independent Auditor</u>.  The Committee shall be directly responsible for appointing, compensating, retaining, overseeing and, where appropriate, replacing any independent auditor engaged by the Company to prepare or issue an audit report or perform any other audit, review or attestation services for the Company. The independent auditor will report directly to the Committee and be ultimately accountable to the Board. The Committee has sole authority to approve the hiring and discharging of the independent auditor, all audit engagement fees and terms and all permissible non-audit engagements with the independent auditor.

2. <u>Supervise and Evaluate the Independent Auditor</u>. The Committee will:

- Oversee and, at least annually, evaluate the work of the independent auditor or any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, which evaluation shall include a review and evaluation of the lead partner of the independent auditor. The Committee

shall review, in consultation with the independent auditor, the annual audit plan and scope of audit activities.

- At least annually, obtain and review a report by the independent auditor that describes (i) the independent auditor's internal quality control review procedures, and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditor or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding any independent audit performed by the independent auditor, and any steps taken to deal with any such issues.

3. <u>Evaluate the Independence of the Independent Auditor</u>. The Committee will:

- Review and discuss with the independent auditor the written independence disclosures required by the applicable requirements of the Public Company Accounting Oversight Board or other regulatory body.

- Review and discuss with the independent auditor at least annually any relationships or services (including permissible non-audit services) that may affect its objectivity and independence.

- Review the rotation of the independent auditor's lead audit and concurring partners and the rotation of other audit partners, with applicable time-out periods, in accordance with applicable law.

- Take appropriate action to oversee the independence of the independent auditor.

4. <u>Approve Audit and Non-Audit Services and Fees</u>. The Committee shall (i) review and approve, in advance, the scope and plans for the audits and the audit fees and (ii) approve in advance (or, where permitted under the rules and regulations of the SEC, subsequently) all non-audit and tax services to be performed by the independent auditor that are not otherwise prohibited by law or regulations and any associated fees. The Committee shall also approve all audit and permitted non-audit and tax services that may be provided by other registered public accounting firms. The Committee may, in accordance with applicable law, establish pre-approval policies and procedures for the engagement of independent accountants and any other registered public accounting firm to render services to the Company, including, but not limited

to, policies that would allow the delegation of pre-approval authority to one or more members of the Committee.

5. <u>Review Financial Statements</u>. The Committee shall review and discuss the following with management, the internal auditors, if applicable, and the independent auditor, as applicable:

- The scope and timing of the annual audit of the Company's financial statements.

- The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.

- The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the audited financial statements.

- The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.

- Major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles.

- Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements.

- The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

- Any significant changes required or taken in the audit plan as a result of any material control deficiency.

- Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

- Any significant disagreements between management and the independent auditor.

6. <u>Reports and Communications from the Independent Auditor</u>. The Committee shall review and discuss reports from the independent auditor concerning the following:

- Critical accounting policies and practices to be used by the Company.

- Alternative treatments of financial information within GAAP that the auditor has discussed with management, ramifications of the use of these alternative disclosures and treatments, and the treatment preferred by the independent auditor if different from that used by management.

- Any material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

- Any matters required to be communicated to the Committee under generally accepted auditing standards and other legal or regulatory requirements.

7. <u>Audit Committee Report</u>. The Committee will prepare the report of the Audit Committee that SEC rules require to be included in the Company's annual proxy statement.

8. <u>Earnings Press Releases and Earnings Guidance</u>. The Committee will review, in general, earnings press releases (including any use of pro form a or other non-GAAP information), and review and discuss with management and the independent auditors policies with respect to earnings press releases, financial information and earnings guidance provided to the public, analysts and ratings agencies.

9. <u>Internal Controls</u>. The Committee shall, as appropriate, review and discuss with management, the internal auditors, if applicable, and the independent

auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted in light of any material control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

10. <u>Disclosure Controls and Procedures</u>. The Committee shall as appropriate review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

11. <u>Legal and Regulatory Compliance</u>. The Committee shall:

- Review and discuss with management, the internal auditors, if applicable, and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs.

- Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

- Discuss with the Company's senior legal officer any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

12. <u>Complaints</u>. The Committee shall establish and oversee procedures for the receipt, retention and treatment of complaints on accounting, internal accounting controls or audit matters, as well as for confidential and anonymous submissions by the Company's employees of concerns regarding questionable accounting or auditing matters.

13. <u>Risk Assessment and Risk Management</u>. The Committee shall review and discuss with management, the internal auditors, if applicable, and the

independent auditor the Company's major risk exposures (whether financial, operating or otherwise) and the steps management has taken to monitor, control and report those exposures, including the Company's guidelines and procedures to govern the process by which risk assessment and risk management are handled.

14. <u>Hiring of Auditor Personnel</u>. The Committee shall set hiring policies with regard to employees and former employees of the independent auditor and oversee compliance with such policies.

\*\*\*

The function of the Committee is primarily one of oversight. The Company's management is responsible for preparing the Company's financial statements, and the independent auditor is responsible for auditing and reviewing those financial statements. The Committee is responsible for assisting the Board in overseeing the conduct of these activities by management and the independent auditor. The Committee is not responsible for providing any expert or special assurance as to the financial statements or the independent auditor's work. It is recognized that the members of the Committee are not full-time employees of the Company, that it is not the duty or responsibility of the Committee or its members to conduct "field work" or other types of auditing or accounting reviews or procedures or to set auditor independence standards, and that each member of the Committee shall be entitled to rely on (i) the integrity of those persons and organizations within and outside the Company from which the Committee receives information and (ii) the accuracy of the financial and other information provided to the Committee, in either instance absent actual knowledge to the contrary.

\*\*\*

68.    Individual Defendants, because of their positions of control and authority as officers and/or directors of ImmunityBio, were able to and did directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal action. As a result, and in addition to the damages the Company already incurred, ImmunityBio has needlessly expended and will continue to needlessly expend, significant sums of money.

**FACTUAL BACKGROUND**

69.     ImmunityBio claims to be a biotechnology company in the clinical stage, concentrating on developing immunotherapies to treat cancer and other infectious diseases. Immunotherapies are a broad category of drugs designed to enhance or stimulate the body's immune system to combat diseases, including cancer. These therapies have gained significant popularity in oncology, particularly when used alongside traditional cancer treatments. ImmunityBio's primary product candidate is a compound called N-803, which is marketed under the name Anktiva.

70.     ImmunityBio was created through the merger of Legacy ImmunityBio and NantKwest on March 9, 2021.   ImmunityBio assumed the assets of both bio-pharmaceutical companies and its publicly traded shares continued to be listed on the NASDAQ under the ticker symbol IBRX as of March 10, 2021.

71.     Prior to the merger, Legacy ImmunityBio had acquired Altor BioScience Corporation around July 2017. With this acquisition, Legacy ImmunityBio gained ownership of Altor's leading cytokine-based therapeutic compound, ALT-803, and continued its development under the name N-803. By August 2020, N-803 was internally referred to as Anktiva.

72.     At the time of the Altor acquisition, Altor had recently begun a Phase 3 clinical trial for N-803 in combination with BCG, targeting BCG-unresponsive patients and papillary forms of NMIBC.

73.     During this period, Altor had outsourced the production of Anktiva to a predecessor of AGC Biologics, Inc. ("AGC"), a third-party contract manufacturing organization (CMO) specializing in protein therapy manufacturing, which had recently been acquired by Asahi Glass Company.

74.     In fact, in April 2017, just two months prior, Altor had entered into a manufacturing agreement with this CMO to produce Anktiva for its upcoming Phase 3 trials. After a corporate reorganization in January 2018, the CMO was renamed AGC.

75.    Before a new drug can be commercially distributed across state lines, it must receive approval from the FDA. The FDA's regulations differentiate between chemically synthesized drugs, referred to as "small molecule" drugs, and therapies derived from living organisms, known as "biologics." Unlike small molecule drugs, the process to seek FDA approval for a biologic, such as Anktiva, involves submitting a biologic license application ("BLA").

76.    A BLA must adhere to stringent guidelines set forth by the FDA rules and guidance. Generally, it contains data and supporting materials gathered from clinical trials, as well as other necessary information to help the FDA assess whether the product meets the required standards for approval. This includes details about how the product is manufactured. In practice, a BLA is an extensive collection of materials, typically including raw study data, historical records, written summaries, and academic literature, all organized in a specific format mandated by the FDA.

77.    The part of the BLA that details the drug's manufacturing process and quality is called the Chemistry, Manufacturing, and Controls ("CMC") section. Unlike small molecule drugs, biologics are structurally complex and not easily defined or characterized. The large-scale production of biologics involves numerous highly technical steps, each of which must be tightly regulated to ensure the final product is consistent and free of impurities. As a result, the CMC section includes comprehensive information about the entire process, including a full description of manufacturing steps from beginning to end, in-process controls at each stage, analytical methods for product testing at various phases, and stability testing to demonstrate that the product maintains its integrity over time, accompanied by relevant supporting documentation.

78.    The CMC section of the BLA not only outlines the proposed manufacturing process and protocols for large-scale production, but also must include data from previously-produced process performance qualification (PPQ) batches made using the specified manufacturing processes and equipment. The aim of these qualification studies is to verify that the proposed manufacturing process can

consistently produce results within the predetermined specifications at a commercial scale.

79.    Crucially, the FDA cannot approve a BLA unless it determines from the submitted materials that the manufacturing process adheres to current Good Manufacturing Practices ("cGMP"). cGMP represents a set of minimum standards and procedures outlined in FDA regulations that companies must follow to ensure that the production, processing, packaging, and storage of drugs are properly controlled. The FDA has stated that these standards ensure the "identity, strength, quality, and purity" of drugs and help prevent issues like "contamination, mix-ups, deviations, failures, and errors." Any drug produced using systems that do not comply with these long-standing cGMP regulations is considered "adulterated," and the responsible party may face regulatory action.

80.    Once a BLA is submitted, the timeline for the FDA to take action is dictated by specific rules. Initially, within 60 days, the FDA will determine whether the BLA is complete enough to "file" it for a thorough review.

81.    During the review process, the FDA will perform a "pre-license inspection" at each facility involved in drug manufacturing, scheduled at a predetermined time. This inspection is intended to verify that the facilities meet the necessary regulatory standards, including compliance with cGMP. Any cGMP violations found during the inspection can result in the denial of the product license.

82.    Pre-license inspections adhere to a standard protocol. Inspectors fulfill their duties by both observing the facility's operations and reviewing relevant records that document past activities. Due to the importance of this inspection, many manufacturers conduct mock inspections, perform cGMP audits, or address any compliance gaps before the FDA review period to reduce the risk of negative findings.

83.    Upon completing its review, the FDA will either approve the BLA or issue a complete response letter ("CRL") to the sponsor. A CRL details any problems identified during the review that prevent the BLA from being approved in its current

form and, when applicable, suggests actions the sponsor can take to resolve the issues or improve the application for approval. After receiving a CRL, the applicant can either resubmit the BLA with revisions to address the deficiencies identified or choose to withdraw the application.

84.    Between March 11, 2021, and March 19, 2021, the FDA carried out a non-routine inspection at the AGC facility where Anktiva was produced. This inspection resulted in the issuance of a Form 483, a document used to formally record significant deficiencies identified during the inspection that, in the inspectors' judgment, represent violations of FDA regulations, including cGMP. FDA investigators ensure that each observation in a Form 483 is clear, detailed, and significant. The document is then presented to and discussed with the company's senior management at the end of the inspection to make sure they fully understand the observations and their significance.

85.    The Form 483 issued by the FDA following the March 2021 inspection included a striking list of sixteen objectionable observations, each supported by numerous examples. Key issues included AGC's quality unit failing to properly investigate deviations, inadequate oversight of manufacturing procedures, insufficient documentation for quality control testing, poorly qualified and validated manufacturing processes, and gaps in record-keeping, which left inspectors unable to determine if manufacturing was under proper control. In response, AGC committed to implementing a Corrective and Preventive Action (CAPA) plan, which included conducting a data integrity risk assessment for its computerized systems.

86.    Just four months later, from July 12, 2021, to July 23, 2021, the FDA conducted a routine cGMP inspection of the same facility. This inspection led to the issuance of a three-item Form 483. Notably, some of the issues identified during the July 2021 inspection would reappear during the FDA's pre-license inspection in February 2023. Furthermore, the FDA criticized AGC for its failure to document conclusions or follow-up actions in response to deviations.

87.     Despite the FDA identifying these serious quality deficiencies, the AGC facility continued to struggle with various quality and control issues prior to the Anktiva BLA submission and the following pre-license FDA inspection.

88.     On May 23, 2022, ImmunityBio announced that it had submitted a BLA to the FDA for Anktiva in combination with BCG for the treatment of BCG-unresponsive patients with the in the form of NMIBC. The BLA included data from previous clinical studies in this patient population, including the recently completed Phase 3 trial, as well as at least three completed PPQ runs for Anktiva at the production facility. ImmunityBio requested priority review for the BLA. In late July 2022, the FDA accepted the BLA for review and set a target PDUFA date of May 23, 2023, placing the BLA on the standard 10-month review timeline.

89.     On November 1, 2022, the FDA notified AGC that it would be conducting a pre-license inspection in February 2023 at the facility responsible for manufacturing the drug substance for Anktiva, in connection with the pending BLA for Anktiva.

90.     A team of six cross-functional FDA specialists carried out the pre-license inspection of the AGC facility responsible for manufacturing Anktiva from February 2, 2023, to February 10, 2023. ImmunityBio sent at least six representatives to attend the inspection and developed a plan to keep leadership updated on the inspection's progress.

91.     However, that plan changed when the FDA identified several deficiencies on the very first day of the inspection. In response, Defendant Adcock immediately flew to Washington overnight to be present for the following days of the inspection. Defendant Soon-Shiong insisted on receiving a personal debriefing call at the end of each day. He also demanded that ImmunityBio employees be present in the room with the inspectors, and AGC eventually agreed to have one of their employees provide real-time updates to ImmunityBio's leadership during the inspection.

92.     At the close-out meeting on February 10, 2023, the FDA issued a sharply critical, 15-page Form 483 containing five items that outlined numerous regulatory violations at the facility. The objectionable conditions were categorized into five main

areas, in line with FDA standard practice, each backed by extensive examples detailing the observations.

93.    The inspectors identified numerous instances of inadequate deviation management, some dating back to January 2021.

94.    During the closeout meeting, FDA personnel reviewed each observation with AGC's senior management, including those mentioned above. In response, AGC management stated that they "understood" each observation and had no additional comments.

95.    To make matters worse, from January 11, 2023, to January 16, 2023, three FDA specialists conducted a pre-license inspection at the facility operated by the CMO responsible for Anktiva's fill site. At the conclusion of the inspection, the FDA issued a five-item Form 483 to the facility's management, outlining several objectionable conditions. These included (1) the site used equipment and conditions that were not properly validated through qualification studies; and (2) there was inadequate equipment maintenance.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

96.    Despite being aware of the persistent and significant cGMP failures at AGC, the Individual Defendants made multiple false and misleading statements to investors regarding the Company's manufacturing strategies and capabilities.

97.    Among other things, the March 10, 2021, Form 8-K disclosed that the company had updated its prior disclosures regarding its business and risk factors following the Legacy ImmunityBio-NantKwest merger. Form 8-K emphasized that cGMP manufacturing was one of the Company's core competencies. The filing stated, in relevant part:[1]

> ImmunityBio, together with its merger with NantKwest, has now progressed into a leading late-stage clinical company with a broad immunotherapy clinical-stage pipeline of over 40 clinical trials in Phase I, II and III development (company

---

[1] Emphases are added unless otherwise noted.

sponsored and investigator initiated) across 19 indications in solid and liquid cancers and infectious diseases….

The expansive clinical-stage pipeline and intellectual property portfolio with 17 first in human antibody cytokine fusion proteins, chemo immune-modulators, vaccine vectors and cell therapies in clinical trials, including 25 in Phase II to III clinical trials, as well as a strong global intellectual property portfolio of issued and pending worldwide patent applications with patent life extending to 2035 and beyond, places ImmunityBio in a leading position to transform immunotherapy care beyond current standards of care. *In addition, the company has adopted the strategy of establishing GMP manufacturing capacity at scale* and to date, the company has cutting-edge cell manufacturing expertise, ready-to-scale facilities, with extensive and seasoned R&D, clinical trial, and regulatory operations and development teams, which together will occupy over 400,000 square feet of manufacturing and R&D facilities.

98.    A key component of ImmunityBio's current business strategy was its investment in manufacturing capabilities for antibody cytokine fusion proteins, including Anktiva:

We seek to become the leading global immunological discovery and therapeutics company by creating the next generation of immunotherapies to address serious unmet needs within oncology and infectious diseases. To achieve this goal, **the key elements of our strategy include**:
…
•    *Optimizing investment in our* discovery, development and manufacturing *capabilities for our next generation targeted antibody cytokine fusion proteins* and vaccine candidates, as well as for cell therapies including utilizing our just-in-time, decentralized advanced cell therapy GMP-in-a-box manufacturing technologies.

99.    Additionally, the March 10, 2021, Form 8-K highlighted specific risks that could negatively affect ImmunityBio's business, financial condition, operating results, or prospects if they materialized, including the following:

*The manufacture of our product candidate is complex, and we may encounter difficulties in production, particularly with respect to process development,*

*quality control, or scaling-up of our manufacturing capabilities. If we or our related parties, or any of our third-party manufacturers encounter such difficulties, our ability to provide supply of our product candidates for clinical trials or our products for patients, if approved, could be delayed or stopped, or we may be unable to maintain a commercially viable cost structure.*

Currently we manufacture our product candidates or use CMOs.

…

In addition, the manufacturing process and facilities for any products that we may develop are subject to FDA and foreign regulatory authority approval processes, and we or our CMOs will need to meet all applicable FDA and foreign regulatory authority requirements, including cGMP, on an ongoing basis. The cGMP requirements include quality control, quality assurance and the maintenance of records and documentation. The FDA and other regulatory authorities enforce these requirements through facility inspections. Manufacturing facilities must submit to pre-approval inspections by the FDA that will be conducted after we submit our marketing applications, including our BLAs and NDAs, to the FDA. Manufacturers are also subject to continuing FDA and other regulatory authority inspections following marketing approval. Further, we and our third-party CMOs must supply all necessary chemistry, manufacturing and quality control documentation in support of a BLA or NDA on a timely basis. *There is no guarantee that we or our CMOs will be able to successfully pass all aspects of a pre-approval inspection by the FDA or other foreign regulatory authorities.*

…

Our or our CMO's manufacturing facilities may be unable to comply with our specifications, cGMP, and with other FDA, state, and foreign regulatory requirements. Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of product candidates that may not be detectable in final product testing. *If we or our CMOs are unable to reliably produce products to specifications acceptable to the FDA or other regulatory authorities, or in accordance with the strict regulatory requirements, we may not obtain or maintain the approvals we need to commercialize such products.*

100.   On March 10, 2021, ImmunityBio issued a press release announcing that the Company's common stock had begun trading on the NASDAQ, following the completion of the Legacy ImmunityBio-NantKwest merger. The press release stated the following:

> ImmunityBio is a leading producer of cryopreserved and clinical dose forms of off-the-shelf natural killer (NK) cell therapies. ***The company has established GMP manufacturing capacity at scale*** with cutting-edge cell manufacturing expertise, ready-to-scale facilities, extensive and seasoned R&D, clinical trial, and regulatory operations and development teams.

101.   On March 10, 2021, ImmunityBio issued a press release announcing that the Company's common stock had begun trading on the NASDAQ, following the completion of the Legacy ImmunityBio-NantKwest merger. The press release stated the following:

> ImmunityBio is a leading producer of cryopreserved and clinical dose forms of off-the-shelf natural killer (NK) cell therapies. ***The company has established GMP manufacturing capacity at scale*** with cutting-edge cell manufacturing expertise, ready-to-scale facilities, extensive and seasoned R&D, clinical trial, and regulatory operations and development teams.

102.   On April 30, 2021, ImmunityBio filed an automatic shelf registration statement on Form S-3 with the SEC to register an unspecified number of debt and equity securities for future issuance (on the "shelf"), which included a related prospectus ("April 2021 Shelf Registration Statement"). The April 2021 Shelf Registration Statement was signed by the Individual Defendants. On May 3, 2023, ImmunityBio filed a prospectus supplement to the April 2021 Shelf Registration Statement with the SEC to facilitate an open market, or "at-the-market," sales agreement the Company entered into with Jeffries LLC for up to a maximum aggregate amount of $500 million of its common stock. As supplemented by the April 2021 Prospectus Supplement, the April 2021 Shelf Registration Statement expressly incorporated by reference the March 10, 2021 Form 8-K, including the materially false and misleading statements.

103.   Furthermore, the April 2021 Shelf Registration Statement specifically incorporated information from the Definitive Proxy Statement on Schedule 14A, which ImmunityBio had filed with the SEC on February 2, 2021 (the "Merger Proxy Statement"). This included all details under the section titled "Business of

ImmunityBio-Manufacturing." In that section, the company claimed that the third-party manufacturer it used for Anktiva maintained robust manufacturing standards:

> **For our Anktiva product candidate, we have contracted with a multi-national biologics manufacturer with multiple cGMP-compliant facilities** in the United States, Europe and Asia for our current clinical trials and future commercial sales, if approved. **The facilities have robust process development and validation and quality oversight** with high-capacity production suites operating multiple 2,000-20,000L production bioreactors.

104.    On May 14, 2021, ImmunityBio filed a quarterly report on Form 10-Q with the SEC for the quarter ending March 31, 2021 (the "1Q 2021 Form 10-Q"), which was signed by Defendants Adcock and Sachs. The 1Q 2021 Form 10-Q detailed various risks that "could" significantly affect ImmunityBio's business, financial condition, operating results, or prospects if they materialized, including the following:

> **The manufacture of our product candidates is complex, and we may encounter difficulties in production, particularly with respect to process development, quality control, or scaling-up of our manufacturing capabilities. If we or our related parties, or any of our third party manufacturers encounter such difficulties, our ability to provide supply of our product candidates for clinical trials or our products for patients, if approved, could be delayed or stopped, or we may be unable to maintain a commercially viable cost structure.**
> …
> Currently we manufacture our product candidates or use CMOs.
> …
> In addition, the manufacturing process and facilities for any products that we may develop are subject to FDA and foreign regulatory authority approval processes, and we or our CMOs will need to meet all applicable FDA and foreign regulatory authority requirements, including cGMP, on an ongoing basis. The cGMP requirements include quality control, quality assurance and the maintenance of records and documentation. The FDA and other regulatory authorities enforce these requirements through facility inspections. Manufacturing facilities must submit to pre-approval inspections by the FDA that will be conducted after we submit our marketing applications, including our BLAs and NDAs, to the FDA. Manufacturers are also subject to continuing FDA and other regulatory authority inspections following marketing approval. Further, we and our third-party CMOs must supply all necessary chemistry, manufacturing and quality control documentation in support of a BLA or NDA on a timely basis. **There is no**

*guarantee that we or our CMOs will be able to successfully pass all aspects of a pre-approval inspection by the FDA or other foreign regulatory authorities.*
…
*Our or our CMO's manufacturing facilities may be unable to comply with our specifications, cGMP, and with other FDA, state, and foreign regulatory requirements*. Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of product candidates that may not be detectable in final product testing. *If we or our CMOs are unable to reliably produce products to specifications acceptable to the FDA or other regulatory authorities, or in accordance with the strict regulatory requirements, we may not obtain or maintain the approvals we need to commercialize such products.*

105. On August 12, 2021, ImmunityBio filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2021 (the "2Q 2021 Form 10-Q"), which was signed by Defendants Adcock and Sachs. The 2Q 2021 Form 10-Q detailed various risks that "could" significantly affect ImmunityBio's business, financial condition, operating results, or prospects if they materialized, including the following:

*The manufacture of our product candidates is complex, and we may encounter difficulties in production, particularly with respect to process development, quality control, or scaling-up of our manufacturing capabilities. If we or our related parties, or any of our third party manufacturers encounter such difficulties, our ability to provide supply of our product candidates for clinical trials or our products for patients, if approved, could be delayed or stopped, or we may be unable to maintain a commercially viable cost structure.*
…
Currently we manufacture our product candidates or use CMOs.
…
In addition, the manufacturing process and facilities for any products that we may develop are subject to FDA and foreign regulatory authority approval processes, and we or our CMOs will need to meet all applicable FDA and foreign regulatory authority requirements, including cGMP, on an ongoing basis. The cGMP requirements include quality control, quality assurance and the maintenance of records and documentation. The FDA and other regulatory authorities enforce these requirements through facility inspections. Manufacturing facilities must submit to pre-approval inspections by the FDA that will be conducted after we submit our marketing applications, including our BLAs and NDAs, to the FDA. Manufacturers are also subject to continuing FDA and other regulatory authority

inspections following marketing approval. Further, we and our third-party CMOs must supply all necessary chemistry, manufacturing and quality control documentation in support of a BLA or NDA on a timely basis. ***Our or our CMOs' manufacturing facilities may be unable to comply with our specifications, cGMP, and with other FDA, state, and foreign regulatory requirements, and there is no guarantee that we or our CMOs will be able to successfully pass all aspects of a pre-approval inspection by the FDA or other foreign regulatory authorities.***

…

Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of product candidates that may not be detectable in final product testing. If microbial, viral, environmental or other contaminations are discovered in our product candidates or in the manufacturing facilities in which our product candidates are made, such manufacturing facilities may need to be closed for an extended period of time to investigate and remedy the contamination which could delay clinical trials and adversely harm our business. ***If we or our CMOs are unable to reliably produce products to specifications acceptable to the FDA or other regulatory authorities, or in accordance with the strict regulatory requirements, we may not obtain or maintain the approvals we need to commercialize such products.***

106. The statements highlighted in bold and italicized text in the preceding paragraphs were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (ii) these cGMP issues were not corrected and were allowed to persist; and (iii) the risks associated with non-compliance with cGMP at the CMO, particularly for the active ingredient in ImmunityBio's "lead" product candidate, were not just theoretical.

107. On September 1, 2021, ImmunityBio issued a press release announcing the oral presentation of new clinical trial results from the Phase 3 trial of Anktiva in patients with BCG-unresponsive bladder cancer at the American Urological Association's Annual Meeting. The press release included the following information:

> ImmunityBio is a leading producer of cryopreserved and clinical dose forms of off-the-shelf natural killer (NK) cell therapies. ***The company has established GMP manufacturing capacity at scale*** with cutting-edge cell manufacturing expertise and ready-to-scale facilities, as well as extensive and seasoned R&D, clinical trial, and regulatory operations and development teams.

108.   On September 13, 2021, ImmunityBio issued a press release announcing the results of the Phase 3 trial of Anktiva in patients with BCG-unresponsive bladder cancer to the current report on Form 8-K, dated September 13, 2021 signed by Defendant Sachs, which represented as follows:

> ImmunityBio is a leading producer of cryopreserved and clinical dose forms of off-the-shelf natural killer (NK) cell therapies. ***The company has established GMP manufacturing capacity at scale*** with cutting-edge cell manufacturing expertise and ready-to-scale facilities, as well as extensive and seasoned R&D, clinical trial, and regulatory operations and development teams.

109.   The statements highlighted in bold and italicized text in the preceding paragraphs were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; and (ii) these cGMP issues were not corrected and were allowed to persist.

110.   On October 19, 2021, ImmunityBio issued a press release to announce the results of the Phase 3 study of Anktiva in patients with the papillary form of bladder cancer, which represented as follows:

> The company's platforms are based on the foundation of four separate modalities: Antibody cytokine fusion proteins, synthetic immunomodulators, second-generation human adenovirus (hAd5) and yeast vaccine technologies, and state-of-the-art, off-the-shelf natural killer cells, including autologous and allogenic cytokine-enhanced memory NK cells. ImmunityBio is currently developing a dual construct COVID-19 vaccine candidate using its hAd5 platform. ***The company has established GMP manufacturing capacity at scale*** with cutting-edge cell manufacturing expertise and ready-to-scale facilities, as well as extensive and seasoned R&D, clinical trial, and regulatory operations and development teams.

111.   The statement highlighted in bold and italicized text in the preceding paragraph were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; and (ii) these cGMP issues were not corrected and were allowed to persist.

112.   On November 12, 2021, ImmunityBio filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2021 (the "3Q 2021 Form 10-Q), which was signed by Defendants Adcock and Sachs. The 2Q 2021 Form 10-Q detailed various risks that "could" significantly affect ImmunityBio's business, financial condition, operating results, or prospects if they materialized, including the following:

> ***The manufacture of our product candidates is complex, and we may encounter difficulties in production, particularly with respect to process development, quality control, or scaling-up of our manufacturing capabilities. If we or our related parties, or any of our third party manufacturers encounter such difficulties, our ability to provide supply of our product candidates for clinical trials or our products for patients, if approved, could be delayed or stopped, or we may be unable to maintain a commercially viable cost structure.***
>
> …
>
> Currently we manufacture our product candidates or we may use third-party CMOs or some of our related parties to manufacture our product candidates.
>
> …
>
> In addition, the manufacturing process and facilities for any products that we may develop are subject to FDA and foreign regulatory authority approval processes, and we or our CMOs will need to meet all applicable FDA and foreign regulatory authority requirements, including cGMP, on an ongoing basis. The cGMP requirements include quality control, quality assurance and the maintenance of records and documentation. The FDA and other regulatory authorities enforce these requirements through facility inspections. Manufacturing facilities must submit to pre-approval inspections by the FDA that will be conducted after we submit our marketing applications, including our BLAs and NDAs, to the FDA. Manufacturers are also subject to continuing FDA and other regulatory authority inspections following marketing approval. Further, we and our third-party CMOs

must supply all necessary chemistry, manufacturing and quality control documentation in support of a BLA or NDA on a timely basis. ***Our or our CMOs' manufacturing facilities may be unable to comply with our specifications, cGMP, and with other FDA, state, and foreign regulatory requirements, and there is no guarantee that we or our CMOs will be able to successfully pass all aspects of a pre-approval inspection by the FDA or other foreign regulatory authorities.***

Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of product candidates that may not be detectable in final product testing. If microbial, viral, environmental or other contaminations are discovered in our product candidates or in the manufacturing facilities in which our product candidates are made, such manufacturing facilities may need to be closed for an extended period of time to investigate and remedy the contamination which could delay clinical trials and adversely harm our business. ***If we or our CMOs are unable to reliably produce products to specifications acceptable to the FDA or other regulatory authorities, or in accordance with the strict regulatory requirements, we may not obtain or maintain the approvals we need to commercialize such products.***

113.    The statements highlighted in bold and italicized text in the preceding paragraphs were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (ii) these cGMP issues were not corrected and were allowed to persist; and (iii) the risks associated with non-compliance with cGMP at the CMO, particularly for the active ingredient in ImmunityBio's "lead" product candidate, were not just theoretical.

114.    On December 20, 2021, ImmunityBio issued a press release detailing recent financing activities and ongoing business initiatives, including the planned BLA submission for Anktiva. This press release was filed with the SEC as part of the current report on Form 8-K, dated December 20, 2021, and signed by Defendant Sachs. The report included the following statement:

The company's platforms are based on the foundation of four separate modalities: Antibody cytokine fusion proteins, synthetic immunomodulators, second-generation human adenovirus (hAd5) and yeast vaccine technologies, and state-of-the-art, off-the-shelf natural killer cells, including autologous and allogenic cytokine-enhanced memory NK cells. ImmunityBio is currently developing a dual construct COVID-19 vaccine candidate using its hAd5 platform. ***The company has established GMP manufacturing capacity at scale*** with cutting-edge cell manufacturing expertise and ready-to-scale facilities, as well as extensive and seasoned R&D, clinical trial, and regulatory operations and development teams.

115.    The statements highlighted in bold and italicized text in the preceding paragraphs were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (ii) these cGMP issues were not corrected and were allowed to persist.

116.    On March 1, 2022, ImmunityBio filed a post-effective amendment to the Shelf Registration Statement (as amended, the "Shelf Registration Statement Amendment No. 1"), which was signed by the Individual Defendants. The Shelf Registration Statement Amendment No. 1 expressly incorporated by reference the March 10, 2021 Form 8-K, including the materially false and misleading statements.

117.    On March 1, 2022, ImmunityBio filed an annual report with the SEC on Form 10-K for the year ended December 31, 2021 (the "2021 Form 10-K"), which was signed by the Individual Defendants. The 2021 Form 10-K emphasized that the Company maintained cGMP manufacturing resources, stating in relevant part:

***We have established Good Manufacturing Practice (GMP) manufacturing capacity at scale*** with cutting-edge cell manufacturing expertise and ready-to-scale facilities, as well as extensive and seasoned research and development (R&D), clinical trial, and regulatory operations and development teams.

118.    The 2021 Form 10-K also assured investors that ImmunityBio develops its products in compliance with cGMP:

***ImmunityBio has adopted a strategic position to*** be vertically integrated and ***develop its products according to the FDA's GMP standards for large-scale manufacturing***, even during Phase 2 clinical trial development. Biological upstream and downstream manufacturing capabilities, with its attendant know-how and regulatory compliance for approval, have long lead times. We have adopted an approach for preparedness to provide our vaccine, immunotherapy and cell therapy products at a global scale. As such, we have established our own plants and have access to facilities on a global basis.

119.    Additionally, in the 2021 Form 10-K, the Company proudly emphasized that the third-party it used to manufacture Anktiva, specifically, had robust manufacturing standards:

***For our Anktiva product candidate, we have contracted with a multi-national biologics manufacturer with multiple cGMP-compliant facilities*** in the U.S., Europe and Asia for our current clinical trials and future commercial sales, if approved. ***The facilities have robust process development and validation and quality oversight*** with high-capacity production suites operating multiple 2,000-20,000L production bioreactors.

120.    The 2021 Form 10-K also detailed various risks that "could" significantly affect ImmunityBio's business, financial condition, operating results, or prospects if they were to occur, including the following:

***The manufacture of our product candidates is complex, and we may encounter difficulties in production, particularly with respect to process development, quality control, or scaling-up of our manufacturing capabilities. If we or our related parties, or any of our third party manufacturers encounter such difficulties, our ability to provide supply of our product candidates for clinical trials or our products for patients, if approved, could be delayed or stopped, or we may be unable to maintain a commercially viable cost structure.***

…

Currently we manufacture our product candidates or we may use third-party CMOs or some of our related parties to manufacture our product candidates.

…

In addition, the manufacturing process and facilities for any products that we may develop are subject to FDA and foreign regulatory authority approval processes, and we or our CMOs will need to meet all applicable FDA and foreign regulatory authority requirements, including cGMP, on an ongoing basis. The cGMP requirements include quality control, quality assurance and the maintenance of records and documentation. The FDA and other regulatory authorities enforce

these requirements through facility inspections. Manufacturing facilities must submit to pre-approval inspections by the FDA that will be conducted after we submit our marketing applications, including our BLAs and NDAs, to the FDA. Manufacturers are also subject to continuing FDA and other regulatory authority inspections following marketing approval. Further, we and our third-party CMOs must supply all necessary chemistry, manufacturing and quality control documentation in support of a BLA or NDA on a timely basis. ***Our or our CMOs' manufacturing facilities may be unable to comply with our specifications, cGMP, and with other FDA, state, and foreign regulatory requirements, and there is no guarantee that we or our CMOs will be able to successfully pass all aspects of a pre-approval inspection by the FDA or other foreign regulatory authorities.***

Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of product candidates that may not be detectable in final product testing. If microbial, viral, environmental or other contaminations are discovered in our product candidates or in the manufacturing facilities in which our product candidates are made, such manufacturing facilities may need to be closed for an extended period of time to investigate and remedy the contamination which could delay clinical trials and adversely harm our business. ***If we or our CMOs are unable to reliably produce products to specifications acceptable to the FDA or other regulatory authorities, or in accordance with the strict regulatory requirements, we may not obtain or maintain the approvals we need to commercialize such products.***

121.    The statements highlighted in bold and italicized text in the preceding paragraphs were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (ii) these cGMP issues were not corrected and were allowed to persist; and (iii) the risks associated with non-compliance with cGMP at the CMO, particularly for the active ingredient in ImmunityBio's "lead" product candidate, were not just hypothetical.

122.    On May 10, 2022, ImmunityBio filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2022 (the "1Q 2022 Form 10-Q"), which

was signed by Defendants Acock and Sachs. The 1Q 2022 Form 10-Q emphasized that the Company maintained cGMP manufacturing resources stating in relevant part:

> **We have established Good Manufacturing Practice (GMP) manufacturing capacity at scale** with cutting-edge cell manufacturing expertise and ready-to-scale facilities, as well as extensive and seasoned research and development (R&D), clinical trial, and regulatory operations and development teams.

123.    Additionally, the 1Q 2022 Form 10-Q outlined certain risks which "could" significantly affect ImmunityBio's business, financial condition, operating results, or prospects if they materialized, including the following:

> **The manufacture of our product candidates is complex, and we may encounter difficulties in production, particularly with respect to process development, quality control, or scaling-up of our manufacturing capabilities. If we or our related parties, or any of our third party manufacturers encounter such difficulties, our ability to provide supply of our product candidates for clinical trials or our products for patients, if approved, could be delayed or stopped, or we may be unable to maintain a commercially viable cost structure.**
> …
> Currently we manufacture our product candidates or we may use third-party CMOs or some of our related parties to manufacture our product candidates.
> …
> In addition, the manufacturing process and facilities for any products that we may develop are subject to FDA and foreign regulatory authority approval processes, and we or our CMOs will need to meet all applicable FDA and foreign regulatory authority requirements, including cGMP, on an ongoing basis. The cGMP requirements include quality control, quality assurance and the maintenance of records and documentation. The FDA and other regulatory authorities enforce these requirements through facility inspections. Manufacturing facilities must submit to pre-approval inspections by the FDA that will be conducted after we submit our marketing applications, including our BLAs and NDAs, to the FDA. Manufacturers are also subject to continuing FDA and other regulatory authority inspections following marketing approval. Further, we and our third-party CMOs must supply all necessary chemistry, manufacturing and quality control documentation in support of a BLA or NDA on a timely basis. **Our or our CMOs' manufacturing facilities may be unable to comply with our specifications, cGMP, and with other FDA, state, and foreign regulatory requirements, and there is no guarantee that we or our CMOs will be able to successfully pass all**

*aspects of a pre-approval inspection by the FDA or other foreign regulatory authorities.*

Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of product candidates that may not be detectable in final product testing. If microbial, viral, environmental or other contaminations are discovered in our product candidates or in the manufacturing facilities in which our product candidates are made, such manufacturing facilities may need to be closed for an extended period of time to investigate and remedy the contamination which could delay clinical trials and adversely harm our business. *If we or our CMOs are unable to reliably produce products to specifications acceptable to the FDA or other regulatory authorities, or in accordance with the strict regulatory requirements, we may not obtain or maintain the approvals we need to commercialize such products.*

124.    The statements highlighted in bold and italicized text in the preceding paragraphs were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (ii) these cGMP issues were not corrected and were allowed to persist; and (iii) the risks associated with non-compliance with cGMP at the CMO, particularly for the active ingredient in ImmunityBio's "lead" product candidate, were not just hypothetical.

125.    On May 23, 2022, ImmunityBio issued a press release announcing the submission of the Anktiva BLA to the FDA, which stated the following:

*The company has established GMP manufacturing capacity at scale* with cutting-edge cell manufacturing expertise and ready-to-scale facilities, as well as extensive and seasoned R&D, clinical trial, and regulatory operations, and development teams.

126.    The statements highlighted in bold and italicized text in the preceding paragraph were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture

Anktiva at a facility plagued by serious and recurring cGMP deficiencies; and (ii) these cGMP issues were not corrected and were allowed to persist.

127. On June 6, 2022, ImmunityBio issued a press release announcing new data from the Phase 3 trial of Anktiva in BCG-unresponsive patients with the CIS form of NMIBC. In this release, Defendant Soon-Shiong stated that the company had developed cGMP manufacturing capacity:

> "**We have, at risk, made the investments to build GMP commercial-scale manufacturing for our platforms** and are now positioned to launch QUILT trials in earlier first-line, neoadjuvant and even preventative settings."

128. The same press release also stated:

> **The company has established GMP manufacturing capacity at scale** with cutting-edge cell manufacturing expertise and ready-to-scale facilities, as well as extensive and seasoned R&D, clinical trial, and regulatory operations, and development teams.

129. The statements highlighted in bold and italicized text in the preceding paragraphs were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (ii) these cGMP issues were not corrected and were allowed to persist.

130. On July 28, 2022, ImmunityBio issued a press release announcing that the FDA had accepted the Anktiva BLA for review. In this release, Defendant Adcock represented that the company was ready to move forward quickly with commercial manufacturing:

> "We are pleased the FDA has begun its review, and **ImmunityBio is prepared to move rapidly to manufacturing** and marketing should the Agency approve our therapeutic for this indication," said Richard Adcock, President and CEO of ImmunityBio.

131. The same press release represented as follows:

***The company has established GMP manufacturing capacity at scale*** with cutting-edge cell manufacturing expertise and ready-to-scale facilities, as well as extensive and seasoned R&D, clinical trial, and regulatory operations, and development teams.

132.    The statements highlighted in bold and italicized text in the preceding paragraphs were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; and (ii) these cGMP issues were not corrected and were allowed to persist.

133.    On August 8, 2022, ImmunityBio filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2022 (the "2Q 2022 Form 10-Q"), which was signed by Defendants Adcock and Sachs. The 2Q 2022 Form 10-Q emphasized that the Company maintained cGMP manufacturing resources stating in relevant part:

***We have established Good Manufacturing Practice (GMP) manufacturing capacity at scale*** with cutting-edge cell manufacturing expertise and ready-to-scale facilities, as well as extensive and seasoned research and development (R&D), clinical trial, and regulatory operations and development teams.

134.    Additionally, the 2Q 2022 Form 10-Q outlined certain risks which "could" significantly affect ImmunityBio's business, financial condition, operating results, or prospects if they materialized, including the following:

***The manufacture of our product candidates is complex, and we may encounter difficulties in production, particularly with respect to process development, quality control, or scaling-up of our manufacturing capabilities. If we or our related parties, or any of our third party manufacturers encounter such difficulties, our ability to provide supply of our product candidates for clinical trials or our products for patients, if approved, could be delayed or stopped, or we may be unable to maintain a commercially viable cost structure.***
…
Currently we manufacture our product candidates or we may use third-party CMOs or some of our related parties to manufacture our product candidates.
…

In addition, the manufacturing process and facilities for any products that we may develop are subject to FDA and foreign regulatory authority approval processes, and we or our CMOs will need to meet all applicable FDA and foreign regulatory authority requirements, including cGMP, on an ongoing basis. The cGMP requirements include quality control, quality assurance and the maintenance of records and documentation. The FDA and other regulatory authorities enforce these requirements through facility inspections. Manufacturing facilities must submit to pre-approval inspections by the FDA that will be conducted after we submit our marketing applications, including our BLAs and NDAs, to the FDA. Manufacturers are also subject to continuing FDA and other regulatory authority inspections following marketing approval. Further, we and our third-party CMOs must supply all necessary chemistry, manufacturing and quality control documentation in support of a BLA or NDA on a timely basis. ***Our or our CMOs' manufacturing facilities may be unable to comply with our specifications, cGMP, and with other FDA, state, and foreign regulatory requirements, and there is no guarantee that we or our CMOs will be able to successfully pass all aspects of a pre-approval inspection by the FDA or other foreign regulatory authorities.***

Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of product candidates that may not be detectable in final product testing. If microbial, viral, environmental or other contaminations are discovered in our product candidates or in the manufacturing facilities in which our product candidates are made, such manufacturing facilities may need to be closed for an extended period of time to investigate and remedy the contamination which could delay clinical trials and adversely harm our business. ***If we or our CMOs are unable to reliably produce products to specifications acceptable to the FDA or other regulatory authorities, or in accordance with the strict regulatory requirements, we may not obtain or maintain the approvals we need to commercialize such products.***

135.    The statements highlighted in bold and italicized text in the preceding paragraphs were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (ii) these

cGMP issues were not corrected and were allowed to persist; and (iii) the risks associated with non-compliance with cGMP at the CMO, particularly for the active ingredient in ImmunityBio's "lead" product candidate, were not just hypothetical.

136.   On November 9, 2022, ImmunityBio filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2022 (the "3Q 2022 Form 10-Q"), which was signed by Defendants Adcock and Sachs. The 3Q 2022 Form 10-Q emphasized that the Company maintained cGMP manufacturing resources stating in relevant part:

> **We have established Good Manufacturing Practice (GMP) manufacturing capacity at scale** with cutting-edge cell manufacturing expertise and ready-to-scale facilities, as well as extensive and seasoned research and development (R&D), clinical trial, and regulatory operations and development teams.

137.   Additionally, the 3Q 2022 Form 10-Q outlined certain risks which "could" significantly affect ImmunityBio's business, financial condition, operating results, or prospects if they materialized, including the following:

> **The manufacture of our product candidates is complex, and we may encounter difficulties in production, particularly with respect to process development, quality control, or scaling-up of our manufacturing capabilities. If we or our related parties, or any of our third party manufacturers encounter such difficulties, our ability to provide supply of our product candidates for clinical trials or our products for patients, if approved, could be delayed or stopped, or we may be unable to maintain a commercially viable cost structure.**
> …
> Currently we manufacture our product candidates or we may use third-party CMOs or some of our related parties to manufacture our product candidates.
> …
> In addition, the manufacturing process and facilities for any products that we may develop are subject to FDA and foreign regulatory authority approval processes, and we or our CMOs will need to meet all applicable FDA and foreign regulatory authority requirements, including cGMP, on an ongoing basis. The cGMP requirements include quality control, quality assurance and the maintenance of records and documentation. The FDA and other regulatory authorities enforce these requirements through facility inspections. Manufacturing facilities must submit to pre-approval inspections by the FDA that will be conducted after we

submit our marketing applications, including our BLAs and NDAs, to the FDA. Manufacturers are also subject to continuing FDA and other regulatory authority inspections following marketing approval. Further, we and our third-party CMOs must supply all necessary chemistry, manufacturing and quality control documentation in support of a BLA or NDA on a timely basis. ***Our or our CMOs' manufacturing facilities may be unable to comply with our specifications, cGMP, and with other FDA, state, and foreign regulatory requirements, and there is no guarantee that we or our CMOs will be able to successfully pass all aspects of a pre-approval inspection by the FDA or other foreign regulatory authorities.***

Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of product candidates that may not be detectable in final product testing. If microbial, viral, environmental or other contaminations are discovered in our product candidates or in the manufacturing facilities in which our product candidates are made, such manufacturing facilities may need to be closed for an extended period of time to investigate and remedy the contamination which could delay clinical trials and adversely harm our business. ***If we or our CMOs are unable to reliably produce products to specifications acceptable to the FDA or other regulatory authorities, or in accordance with the strict regulatory requirements, we may not obtain or maintain the approvals we need to commercialize such products.***

138.    The statements highlighted in bold and italicized text in the preceding paragraphs were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (ii) these cGMP issues were not corrected and were allowed to persist; and (iii) the risks associated with non-compliance with cGMP at the CMO, particularly for the active ingredient in ImmunityBio's "lead" product candidate, were not just hypothetical.

139.    On November 10, 2022, ImmunityBio issued a press release announcing the publication of the full results of the Phase 3 trial of Anktiva with BCG in BCG-unresponsive patients with the CIS form of NMIBC, which represented as follows:

*The company has established GMP manufacturing capacity at scale* with cutting-edge cell manufacturing expertise and ready-to-scale facilities, as well as extensive and seasoned R&D, clinical trial, and regulatory operations, and development teams.

140.    The statement highlighted in bold and italicized text in the preceding paragraph were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (ii) these cGMP issues were not corrected and were allowed to persist.

141.    On February 7, 2023, ImmunityBio filed an automatic shelf registration statement on Form S-3 with the SEC to register an unspecified number of debt and equity securities not to exceed a total aggregate price of $750 million for future issuance(on the "shelf"), which included a related prospectus ("February 2023 Shelf Registration Statement"). The February 2023 Shelf Registration Statement was signed by the Individual Defendants. The SEC declared the statement effective on February 9, 2023. On February 16, 2023, ImmunityBio filed a final prospectus supplement to the February 2023 Shelf Registration Statement with the SEC to facilitate a registered direct offering of approximately $50 million in ImmunityBio common stock and warrants to purchase up to $60 million in additional common stock. The February 2023 Shelf Registration Statement, as supplemented by the February 2023 Prospectus Supplement, acknowledged that it was "unclear" when, or if, the FDA would approve the pending Anktiva BLA:

In May 2022, we announced the submission of a Biologics License Application (BLA) to the FDA for our product candidate, Anktiva in combination with BCG for the treatment of patients with BCG-unresponsive NMIBC with CIS with or without Ta or T1 disease. In July 2022, we announced the FDA has accepted our BLA for review and set a target Prescription Drug User Fee Act (PDUFA) action date of May 23, 2023. *It is unlcear when the FDA will approve our BLA, if at all.*

142.   The February 2023 Shelf Registration Statement also represented as follows:

> **We have established Good Manufacturing Practice (GMP) manufacturing capacity at scale** with cutting-edge cell manufacturing expertise and ready-to-scale facilities, as well as extensive and seasoned research and development (R&D), clinical trial, and regulatory operations and development teams.

143.   Furthermore, the February 2023 Shelf Registration Statement expressly incorporated by reference the 2021 Form 10-K, the 1Q 2022 Form 10-Q, the 2Q 2022 Form 10-Q, and the 3Q 2022 Form 10-Q.

144.   The statements highlighted in bold and italicized text in the preceding paragraphs were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (ii) these cGMP issues were not corrected and were allowed to persist; (iii) the FDA identified a range of significant cGMP violations at the facility during the pre-license inspection for Anktiva, which indicated that the firm's quality unit was not effectively fulfilling its authority and responsibilities; and, accordingly, (iv) the risks arising from non-compliance with cGMP at a CMO responsible for manufacturing a product for ImmunityBio, particularly the active ingredient in its "lead" product candidate under FDA review, were not merely hypothetical; and (v) far from being "uncertain" whether the FDA would approve the Anktiva BLA, such approval was no longer a viable outcome.

145.   On March 1, 2023, ImmunityBio filed an annual report with the SEC on Form 10-K for the year ended December 31, 2022 (the "2022 Form 10-K"), which was signed by the Individual Defendants. The 2022 Form 10-K emphasized that the Company maintained cGMP manufacturing resources stating in relevant part:

> **We have established Good Manufacturing Practice (GMP) manufacturing capacity at scale** with cutting-edge cell manufacturing expertise and ready-to-

scale facilities, as well as extensive and seasoned research and development (R&D), clinical trial, and regulatory operations and development teams.

146.    The 2022 Form 10-K also assured investors that ImmunityBio develops its products in accordance with cGMP:

> **ImmunityBio has adopted a strategic position to be vertically integrated and develop its products according to the FDA's GMP standards for large-scaling manufacturing**, even during Phase 2 clinical trial development. Biological upstream and downstream manufacturing capabilities, with its attendant know-how and regulatory compliance for approval, have long lead times. We have adopted an approach for preparedness to provide our vaccine, immunotherapy and cell therapy products at a global scale. As such, we have established our own plants and have access to facilities on a global basis.

147.    In the 2022 Form 10-K, the Company proudly emphasized that the third-party it used to manufacture Anktiva, specifically, had robust manufacturing standards:

> **For our N-803 product candidate, we have contracted with a multi-national biologics manufacturer with multiple cGMP-compliant facilities** in the U.S., Europe and Asia for our current clinical trials and future commercial sales, if approved. **The facilities have robust process development and validation and quality oversight** with high-capacity production suites operating multiple 2,000-20,000L production bioreactors.

148.    Additionally, the 3Q 2022 Form 10-Q outlined certain risks which "could" significantly affect ImmunityBio's business, financial condition, operating results, or prospects if they materialized, including the following:

> **The manufacture of our product candidates is complex, and we may encounter difficulties in production, particularly with respect to process development, quality control, or scaling-up of our manufacturing capabilities. If we or our related parties, or any of our third party manufacturers encounter such difficulties, our ability to provide supply of our product candidates for clinical trials or our products for patients, if approved, could be delayed or stopped, or we may be unable to maintain a commercially viable cost structure.**
> …
> Currently we manufacture our product candidates or we may use third-party CMOs or some of our related parties to manufacture our product candidates.

…

In addition, the manufacturing process and facilities for any products that we may develop are subject to FDA and foreign regulatory authority approval processes, and we or our CMOs will need to meet all applicable FDA and foreign regulatory authority requirements, including cGMP, on an ongoing basis. The cGMP requirements include quality control, quality assurance and the maintenance of records and documentation. The FDA and other regulatory authorities enforce these requirements through facility inspections. Manufacturing facilities must submit to pre-approval inspections by the FDA that will be conducted after we submit our marketing applications, including our BLAs and NDAs, to the FDA. Manufacturers are also subject to continuing FDA and other regulatory authority inspections following marketing approval. Further, we and our third-party CMOs must supply all necessary chemistry, manufacturing and quality control documentation in support of a BLA or NDA on a timely basis. ***Our or our CMOs' manufacturing facilities may be unable to comply with our specifications, cGMP, and with other FDA, state, and foreign regulatory requirements, and there is no guarantee that we or our CMOs will be able to successfully pass all aspects of a pre-approval inspection by the FDA or other foreign regulatory authorities.***

Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of product candidates that may not be detectable in final product testing. If microbial, viral, environmental or other contaminations are discovered in our product candidates or in the manufacturing facilities in which our product candidates are made, such manufacturing facilities may need to be closed for an extended period of time to investigate and remedy the contamination which could delay clinical trials and adversely harm our business. ***If we or our CMOs are unable to reliably produce products to specifications acceptable to the FDA or other regulatory authorities, or in accordance with the strict regulatory requirements, we may not obtain or maintain the approvals we need to commercialize such products.***

149.    Finally, the 2022 Form 10-K stated that it was "unclear" when, or if, the FDA would approve the pending Anktiva BLA:

In May 2022, we announced the submission of a Biologics License Application (BLA) to the FDA for our product candidate, Anktiva in combination with BCG for the treatment of patients with BCG-unresponsive NMIBC with CIS with or without Ta or T1 disease. In July 2022, we announced the FDA has accepted our

BLA for review and set a target Prescription Drug User Fee Act (PDUFA) action date of May 23, 2023. ***It is unlcear when the FDA will approve our BLA, if at all.***

150.   The statements highlighted in bold and italicized text in the preceding paragraphs were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (ii) these cGMP issues were not corrected and were allowed to persist; (iii) the FDA identified a range of significant cGMP violations at the facility during the pre-license inspection for Anktiva, which indicated that the firm's quality unit was not effectively fulfilling its authority and responsibilities; and, accordingly, (iv) the risks arising from non-compliance with cGMP at a CMO responsible for manufacturing a product for ImmunityBio, particularly the active ingredient in its "lead" product candidate under FDA review, were not merely hypothetical; and (v) far from being "uncertain" whether the FDA would approve the Anktiva BLA, such approval was no longer a viable outcome.

151.   On March 20, 2023, ImmunityBio filed a current report on Form 8-K with the SEC (the "March 20, 2023 Form 8-K") to provide updates on various ongoing business initiatives. The report, signed by Defendant Sachs, stated, among other things, that it was "unclear" when, or if, the FDA would approve the pending Anktiva BLA:

> As previously disclosed, in May 2022 ImmunityBio, Inc. (the "Company") announced the submission of a Biologics License Application ("BLA") to the United States Food and Drug Administration ("FDA") for N-803 in combination with bacillus Calmette-Guerin ("BCG") for the treatment of patients with BCG-unresponsive NMIBC with carcinoma in situ ("CIS") with or without Ta or T1 disease. In July 2022, we announced that the FDA had accepted our BLA for review and set a target Prescription Drug User Fee Act ("PDUFA") action date of May 23, 2023. The Company continues to engage in ongoing discussions and dialogue with the FDA, including the proposed label for the product candidate under review in the BLA. ***It remains unclear if the FDA will approve our BLA on the PDUFA action date, if at all.***

152.   The March 20, 2023 Form 8-K also informed investors that the Company was focused on preparing for the approval of the Anktiva BLA:

*As the Company remains focused on preparing for the potential approval of the BLA by the FDA as described above*, it intends to continue to explore opportunities to engage in incremental financing transactions to raise the working capital needed to fund the Company's ongoing operations through the anticipated May 23, 2023 PDUFA date and execute the Company's business strategy and initiatives.

153.   The statements highlighted in bold and italicized text in the preceding paragraphs were materially false and misleading at the time they were made, or omitted critical facts necessary to make them not misleading. As described in greater detail above, ImmunityBio failed to disclose that: (i) it relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (ii) these cGMP issues were not corrected and were allowed to persist; (iii) the FDA identified a range of significant cGMP violations at the facility during the pre-license inspection for Anktiva, which indicated that the firm's quality unit was not effectively fulfilling its authority and responsibilities; and, accordingly, (iv) far from being "uncertain" whether the FDA would approve the Anktiva BLA, such approval was no longer a viable outcome.

## THE TRUTH EMERGES

154.   On May 11, 2023, ImmunityBio filed a current report with the SEC on Form 8-K during pre-market hours (the "May 11, 2023 Form 8-K"). The report disclosed that on May 9, 2023, the FDA had issued a Complete Response Letter (CRL) in connection with the Anktiva BLA, citing deficiencies found during the FDA's pre-license inspection of the company's CMOs. The May 11, 2023 Form 8-K revealed the following key information:

ImmunityBio, Inc. (the "Company") announces that it has received a complete response letter from the U.S. Food and Drug Administration ("FDA") on May 9, 2023 regarding its Biologics License Application ("BLA") for its product candidate, Anktiva (N-803) in combination with Bacillus Calmette-Guerin

("BCG") for the treatment of patients with BCG-unresponsive non-muscle invasive bladder cancer ("NMIBC") with carcinoma in situ ("CIS") with or without Ta or T1 disease. ***The letter indicates that the FDA has determined that it cannot approve the BLA in its present form,*** and the FDA has made recommendations to address the issues raised.

***The deficiencies relate to the FDA's pre-license inspection of the Company's third-party contract manufacturing organizations. Satisfactory resolution of the observations noted at the pre-license inspection is required before the BLA may be approved***. The FDA further provided recommendations specific to additional Chemistry, Manufacturing and Controls ("CMC") issues and assays to be resolved.

148.   Following this news, ImmunityBio's common stock dropped by $3.43 per share, or 55.15%, on heavy trading volume, closing at $2.79 on May 11, 2023.

## THE SECURITIES CLASS ACTION

149.   On June 30, 2023, a Securities Class Action was filed against the Company and certain Individual Defendants in the United States District Court for the Southern District of California, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

150.   On June 20, 2024, the court in the Securities Class Action denied in part the defendants' motion to dismiss. The court concluded, among other findings, that the Amended Complaint sufficiently alleges that the defendants made statements that "were materially false or misleading."

151.   Specifically, the court found, among other things, that the plaintiff in the Securities Class Action alleged sufficiently that the individual defendants in that action "materially misrepresented" facts regarding the Company's "severe and persistent manufacturing deficiencies."

## SUMMARY OF THE INDIVIDUAL DEFENDANTS WRONGFUL CONDUCT

152.   The Individual Defendants breached their fiduciary duties because they

allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

153.  The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls, and procedures.

154.  The Individual Defendants breached their fiduciary duties to ImmunityBio because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K, Proxy, press releases, soliciting materials described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the Defendants falsely stated/or failed to disclose the following on their watch that: (1) the Company relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (2) these cGMP issues were not corrected and were allowed to persist; (3) the FDA identified a range of significant cGMP violations at the facility during the pre-license inspection for Anktiva, which indicated that the firm's quality unit was not effectively fulfilling its authority and responsibilities; and, accordingly; (4) far from being "uncertain" whether the FDA would approve the Anktiva BLA, such approval was no longer a viable outcome; and (5) therefore, the Company's communications to the public were substantially misleading throughout the relevant times.

## DAMAGES TO IMMUNITYBIO

155.  As a direct and proximate result of the Individual Defendants' misconduct, ImmunityBio has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

156.  Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its CEO, CFO, and Chief Scientific and Medical Officer any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

157. These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

158. These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

159. As a direct and proximate result of the Individual Defendants' actions, ImmunityBio has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

160. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

161. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

162. Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

163. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

164. During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

165.   Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

166.   The Company's Board is currently comprised of nine members: Defendants Soon-Shiong, Adcock, Cohen, Blaszyk, Brennan, Maxwell, Clark, Selecky, and Simon (the "Director Defendants"). Thus, Plaintiff is only required to show that a majority of the Defendants, i.e., 5, cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

167.   Each of the Directors approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

168.   Each of the Directors authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

**Defendant Soon-Shiong**

169.   Defendant Soon-Shiong is not disinterested or independent, and therefore, is incapable of considering demand because he is the Company's founder, controlling shareholder – beneficially owning 82.82% of the Company's common stock, and current Global Chief Scientific and Medical Officer.  Soon-Shiong, thus, derives substantially all of his wealth and livelihood from his relationship with the Company making him not disinterested or independent.

170.   The lack of independence and financial benefits received by Soon-Shiong renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

171.   In addition, Soon-Shiong is a defendant in the Securities Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

172.   Furthermore, the Company's 2024 Annual Proxy Statement, filed with the SEC on April 29, 2024 (the "2024 Proxy") concedes that Soon-Shiong is not an independent director.

173.   As such, Defendant Soon-Shiong cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

**Defendant Adcock**

174.   Defendant Adcock is not disinterested or independent, and therefore, is incapable of considering demand because, Adcock  is, and was at all relevant times, an employee (CEO since October 2020 and President of the Company since March 2021) who derived substantially all of his wealth and livelihood from his relationship with the Company making him not disinterested or independent.

175.   The lack of independence and financial benefits received by Adcock renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

176.   In addition, Adcock is a defendant in the Securities Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

177.   Furthermore, the Company's 2024 Proxy concedes that Adcock is not an independent director.

178.   As such, Defendant Adcock cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

**Defendant Simon**

179.   Defendant Simons is not disinterested or independent, and therefore, is incapable of considering demand because, Simon is, and was at all relevant times, an

employee (Chief Corporate Affairs Officer since March 2021)[2] who derived substantially all of his wealth and livelihood from his relationship with the Company making him not disinterested or independent.

180.   The lack of independence and financial benefits received by Simon renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

181.   Furthermore, the Company's 2024 Proxy concedes that Simon is not an independent director.

182.   As such, Defendant Simon cannot independently consider any demand to sue herself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

**Defendants Blaszyk, Cohen, Selecky, and Maxwell**

183.   Defendants Blaszyk (Chair), Cohen, Selecky, and Maxwell are not disinterested or independent and, therefore, are incapable of considering demand because they serve as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless regard these Defendants caused these improper statements.

184.   In addition, Defendant Blaszyk is a director/manager for Medicus, NantHealth (a company affiliated with Dr. Soon-Shiong).

185.   For these reasons, Blaszyk (Chair), Cohen, Selecky, and Maxwell breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore excused.

---

[2] Simon was also the Company's CEO from 2007 to 2015.

186.   The Directors, as members of the Board, were and are subject to the Code of Business Conduct and Ethics, which go well beyond the basic duties required by applicable laws, rules, and regulations.  Specifically, the Codes require Directors to act in good faith, responsibly, with due care, avoid conflicts of interest, ensure accurate and timely disclosures, and promptly report any violations. The Director Defendants violated these Codes because they knowingly or recklessly permitted the Company to issue materially false and misleading statements alleged herein. Consequently, the Director Defendants breached the Company's Code of Conduct and Code of Ethics, face substantial liability, and are not independent or disinterested, making demand upon them futile.

187.   Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately assessing and managing risks, overseeing the Company's internal control over financial reporting, overseeing disclosure controls and procedures and calling into question the Individual Defendants' conduct.  Thus, any demand upon the Directors would be futile.

188.   ImmunityBio has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for ImmunityBio any part of the damages ImmunityBio suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

189.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the

Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

190. The acts complained of herein constitute violations of fiduciary duties owed by ImmunityBio's officers and directors, and these acts are incapable of ratification.

191. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of ImmunityBio. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of ImmunityBio, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

192. If there is no directors' and officers' liability insurance, then the Directors will not cause ImmunityBio to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

193. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least five of them, cannot consider a demand with

disinterestedness and independence.    Consequently, a demand upon the Board is excused as futile.

### CLAIMS FOR RELIEF
### COUNT I
**Breach of Fiduciary Duty**
**Against the Individual Defendants**

194.   Plaintiff incorporates by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

195.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ImmunityBio's business and affairs.

196.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of ImmunityBio's shareholders.

197.   In breach of their fiduciary duties owed to ImmunityBio, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

198.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material

misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ImmunityBio's securities.

199.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ImmunityBio's securities.

200.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

201.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ImmunityBio has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

202.   Plaintiff, on behalf of ImmunityBio, has no adequate remedy at law.

**COUNT II**
**Violations of Section 14(a) of the Exchange Act**
**Against the Director Defendants**

203.   Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

204.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the

protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

205.    Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

206.    Under the direction and watch of the Director Defendants, the Company made materially misleading statements in its Annual Proxies filed with the SEC on April 29, 2021, April 29, 2022, and April 28, 2023 (collectively, the "Proxies"). Specifically, Proxies contained false statements and failed to disclose that (i) the Company relied on a CMO to manufacture Anktiva at a facility plagued by serious and recurring cGMP deficiencies; (ii) these cGMP issues were not corrected and were allowed to persist; (iii) the FDA identified a range of significant cGMP violations at the facility during the pre-license inspection for Anktiva, which indicated that the firm's quality unit was not effectively fulfilling its authority and responsibilities; and, accordingly, (iv) far from being "uncertain" whether the FDA would approve the Anktiva BLA, such approval was no longer a viable outcome.

207.    The Director Defendants knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the Proxies were materially false and misleading.

208.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxies.

209.    Plaintiff has no adequate remedy at law.

### COUNT III
**Unjust Enrichment Against**
**Against the Individual Defendants**

210. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of ImmunityBio.

212. Each of the Defendants received payment from ImmunityBio, in the form of either salary or director fees while actively breaching their fiduciary duties to ImmunityBio.

213. All the payments and benefits provided to defendants were at the expense of ImmunityBio. The Company received no benefit from these payments.

214. Plaintiff, as a shareholder and a representative of ImmunityBio, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

215. Plaintiff, on behalf of ImmunityBio, has no adequate remedy at law.

### COUNT IV
**Waste of Corporate Assets**
**Against the Individual Defendants**

216. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

217. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused ImmunityBio to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

218.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

219.   Plaintiff, on behalf of ImmunityBio, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a) Declaring that the Plaintiff may maintain this action on behalf of ImmunityBio and that Plaintiff is an adequate representative of the Company;

b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to ImmunityBio;

c) Determining and awarding to ImmunityBio the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d) Directing the Individual Defendants to take all necessary actions to reform and improve ImmunityBio's corporate governance and internal procedures to comply with applicable laws and to protect ImmunityBio and its shareholders from a repeat of the damaging events described herein;

e) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 29, 2024

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: /s/ Alex J. Tramontano
ALEX J. TRAMONTANO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BETSY C. MANIFOLD
RACHELE R. BYRD
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

JUSTIN A. KUEHN
**KUEHN LAW, PLLC**
53 Hill Street, Suite 605
Southampton, NY 11968
Telephone: (833) 672-0814
justin@kuehn.law

*Attorneys for Plaintiff*